510 F.2d 894
 184 U.S.P.Q. 521, 1975-1 Trade Cases 60,127
 The TELEX CORPORATION, and Telex Computer Products, Inc.,
Plaintiffs-Appellees-Appellants (and Appellants on
Counterclaim),
v.
INTERNATIONAL BUSINESS MACHINES CORPORATION,
Defendant-Appellant-Appellee (and Cross-Appellant
on Counterclaim).
 Nos. 73--1874 to 73--1878, 73--1961 and 73--1962.
 United States Court of Appeals,
Tenth Circuit.
 Order Jan. 24, 1975.
Opinion Jan. 28, 1975.
Rehearing Denied March 27, 1975.
 
 Thomas D. Barr, New York City, and Nicholas DeB. Katzenbach, Armonk, N.Y. (Frederick A. O. Schwarz, Jr., Robert F. Mullen, and George Vradenburg III, New York City, Truman B. Rucker, Rucker, Tabor, McBride & Hopkins, Tulsa, Okl., Robert H. Harry, Davis, Graham & Stubbs, Denver, Colo., and Cravath, Swaine & Moore, New York City, of counsel, with them on the brief), for defendant-appellant, International Business Machines Corp.
 Floyd L. Walker, Walker, Jackman & Associates, Inc., Tulsa, Okl., and Richard B. McDermott, Boesche, McDermott & Eskridge, Tulsa, Okl. (Serge Novovich, Tulsa, Okl., with them on the brief), for plaintiffs-appellees, The Telex Corp., and Telex Computer Products, Inc.
 Before SETH, McWILLIAMS and DOYLE, Circuit Judges.
 ORDER
 PER CURIAM.
 
 
 1
 The judgment of the trial court in favor of Telex Corporation and Telex Computer Products, Inc. and against IBM must be and the same is hereby reversed for reasons fully set forth in the court's opinion which will follow. In brief summary, the court does hereby:
 
 
 2
 Reverse that part of the judgment of the trial court which entered money judgment against IBM. This reversal is based on this court's determination that the trial court erred in defining relevant market or market as the term is used in the antitrust laws and within the scope of which the framework of competition, the market shares, the acts and the identity of the competitors may be evaluated and compared. This fundamental misconception affected the remainder of the court's decision.
 
 
 3
 Secondly, the judgment against IBM is reversed because of the trial court's findings of fact as to the acts of IBM and the court's determination that these acts were predatory and contrary to the Sherman Antitrust Act. The evidence establishes that IBM's actions constituted valid competitive practice and were neither predatory nor otherwise violative of the antitrust acts.
 
 
 4
 The judgment of the trial court against Telex based on the counterclaim of IBM which finds that Telex had misappropriated and pirated trade secrets of IBM is supported by the evidence and law and affirmed as to the liability of Telex. The damage award is reduced to $17,500,000 compensatory damages; the judgment in the amount of $1,000,000 punitive is affirmed. As modified, this judgment on the counterclaim is affirmed.
 
 
 5
 We do hereby vacate the trial court's awards of attorney fees and costs. On remand the trial court is directed to reconsider its awards of costs and attorney fees in the light of the action taken in this court. The parties are directed to bear their own costs and attorney fees incurred in this appeal.
 
 
 6
 The judgment, as fully expressed in our opinion, is reversed and remanded to the district court with directions to enter judgment in favor of IBM on the Telex complaint and for award of costs and attorney fees at the trial and for the modification of judgment in favor of IBM on its counterclaim as above provided.
 
 
 7
 The opinion of the court will be filed in the next several days.
 
 I.
 
 8
 COMPLAINT AND DISCOVERY PROCEEDINGS.
 
 
 9
 The appellant, International Business Machines Corporation (IBM), here appeals a judgment in favor of Telex Computer Products, Inc. (Telex), appellee, in the total amount of $259.5 million, plus.$1.2 million in attorneys' fees and costs (this latter amount was stipulated by the parties). Actual damages were determined to be in the amount of $117.5 million. This amount was reduced substantially before trebling so as to prevent Telex from profiting as a result of certain advantages obtained from unlawful competitive activities and its illegal obtaining of trade secrets of IBM. Originally the trial court had ordered damages in favor of Telex in the amount of $352.5 million, but in amended findings and judgment this was reduced as stated above.
 
 
 10
 Telex has alleged in the complaint that IBM violated sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and section 2 of the Clayton Act, 15 U.S.C. § 13, in that IBM had monopolized and attempted to monopolize the manufacture, distribution, sale, and leasing of electronic data processing equipment. The complaint was later amended to charge IBM in more specific terms with monopolization in the manufacture, distribution, sale, and leasing of plug compatible peripheral products which are attached to IBM central processing units.
 
 
 11
 IBM in turn filed a counterclaim against Telex in which the latter is charged with unfair competition, theft of trade secrets, and copyright infringement pursuant to both state law and 17 U.S.C. § 101.
 
 
 12
 It is alleged that jurisdiction is based upon 15 U.S.C. § 15, which makes provision for a private claim for injuries resulting from violation of federal antitrust laws. IBM's counterclaim, sounding in unfair competition and copyright infringement, is allegedly brought pursuant to 28 U.S.C. § 1332 (diversity of citizenship) and § 1338.
 
 
 13
 Following the filing of the case, it was transferred to the United States District Court for the District of Minnesota. This was for pretrial proceedings together with other cases against IBM which were then pending.
 
 
 14
 A supplemental complaint was filed by Telex. This charged that IBM had violated section 2 of the Sherman Act by announcing its 'Fixed Term Plan' and 'Extended Term Plan' for the leasing of IBM equipment.
 
 
 15
 Still other supplemental claims were filed by Telex alleging other violations and seeking an injunction to prohibit IBM from integrating memory and disk control circuitry as well as from lowering its prices on memories.
 
 
 16
 The court in Minnesota issued a temporary restraining order enjoining IBM from announcing its new central processing units. However, this order was dissolved by the Court of Appeals for the Eighth Circuit. Following the completion of discovery, the instant case was remanded to the United States District Court for the Northern District of Oklahoma for trial.
 
 
 17
 Further pretrial conferences were held in the District Court during February, March, and April 1973, and following waiver of a jury the cause went to trial to the court on April 16, 1973. The trial was for twenty-nine days. The District Court on September 17, 1973, issued very extensive findings of fact and conclusions of law in which it, as has been noted, entered judgment in favor of Telex against IBM. The trial court amended its findings of fact and conclusions of law and entered a reduced judgment on November 9, 1973.
 
 II.
 
 18
 EVIDENCE PRESENTED AT THE TRIAL.
 
 
 19
 The evidence established that IBM was first incorporated in 1924 and operated as a producer of office machinery and equipment. However, in the early 1950's it entered the electronic data processing industry. It produced a research computer in 1953 and installed its first computer for use in commercial work in 1955. Telex began manufacturing electronic data processing products in the year 1959. The evidence established in the court found that the electronic data processing industry was a young, dynamic one with a tremendous amount of revenue. In 1952 its total revenues were $48 million. By 1970 its total revenues equalled $10.2 billion. The number of companies in the electronic data processing business grew from thirteen in 1952 to 1,773 in 1970. Nevertheless, IBM, although originally dominant, steadily declined. It had 64.1 per cent of the electronic data processing revenues in 1952, but only 35.1 per cent of the total revenue in the year 1970. Although IBM was recognized as an industry leader, having more revenue from the industry than any other company, it did not, according to the finding of the trial court, have monopoly power or status in the industry as a whole.[1]
 
 
 20
 At the outset it is necessary to distinguish between the general systems portion of the industry which encompasses the manufacture of the basic electronic data processing system, the essential equipment being a central processing unit. The number of manufacturers engaged in the manufacturing of the processing units increased dramatically, from three in 1952 to ninety-six in 1972. The court found that about eight or nine of these were considered principal manufacturers. In the segment of the industry involving the manufacture of the central processing units, IBM did not have monopoly power, although it was estimated by the court that its market share was about thirty-five per cent.
 
 
 21
 In addition to the central processing unit, a data processing system also has a number of so-called peripheral devices which are connected with the central processing unit and which perform various special functions in the data processing system. These include information storage components like magnetic tape drives, magnetic disk drives, magnetic drums and magnetic strip files; terminal devices such as printers; memory units, which are specialized storage units, and other similar types of peripheral components. Sometimes these devices are included in the central processing unit, that is, do not exist as external components. It is these peripheral components with which we are primarily concerned in this lawsuit. The importance of these can be judged from the fact that the court found that they constitute 50 to 75 per cent of the total price of an electronic data processing system. The term 'plug compatible peripheral device' is the specific class of equipment that enters into this case. What is meant is that a producer of a complete electronic processing unit manufactures, as noted, the central processing unit and peripheral components which are geared to use on that central processing unit. Many manufacturers produce peripheral components primarily for attachment to central processing units of a particular manufacturer and so, therefore, the plug compatible peripheral device refers to a component which is functionally equivalent to the manufacturer's peripheral device and can be readily plugged into that central processing unit. Undoubtedly it is the wide use of the IBM central processing unit that caused Telex and others to market peripheral devices which were plug compatible with the IBM unit and which could replace IBM peripheral devices which had been made for the IBM central system.
 
 The Relevant Market:
 
 22
 The District Court found that there existed a definable market for all peripheral devices plug compatible with IBM processing units. The court further found that there were individual submarkets for each particular type of peripheral product.
 
 
 23
 In making its finding as to the scope and extent of the plug compatible peripheral, the trial court used IBM documents which found that the original entry into the market was relatively simple and easy because the manufacturer needed only to produce the peripheral device and he could copy tested IBM peripheral products. The number of manufacturers of IBM peripherals arose from two or three in 1966 to approximately 100 as of the time of trial. Telex and some eleven others were the major manufacturers of IBM plug compatible products.
 
 
 24
 Originally, of course, IBM, being the only manufacturer of peripheral products plug compatible with its system, had 100 percent of the market. The court found that as other manufacturers entered the plug compatible market with IBM, the IBM share became substantially eroded and this is particularly true starting in 1968, at which time market erosion occurred first in the tape drive line followed by the disk drive line in 1969 and with continued erosion into 1970.[2]
 
 
 25
 The court considered the erosion of IBM's market in this area as appropriate background for consideration of the IBM antitrust violations which the court concluded had occurred. The primary determination was that IBM was guilty of monopolization or attempting to monopolize, contrary to section 2 of the Sherman Act in five specific respects:
 
 
 26
 1. Announcement and institution of the 2319A disk storage facility in September 1970.
 
 
 27
 2. The announcement of the 2319B disk storage facility in December 1970.
 
 
 28
 3. The announcement of the Fixed Term Plan long term leasing program in May 1971.
 
 
 29
 4. The announcement and implementation of the Extended Term Plan, which was also a leasing plan, in March 1972.
 
 
 30
 5. IBM's pricing policies with regard to its memory products during 1970 and 1971.
 
 
 31
 The Above-Mentioned 2319A and 2319B Programs:
 
 
 32
 These took place following the erosion of the IBM share of the plug compatible peripheral market. Management became even more concerned when in January 1970 the United States Bureau of the Budget notified the federal agencies that they should consider the possibility of using the less expensive non-IBM plug compatible peripheral devices with the IBM central processing unit. IBM's management committee thereafter designated peripherals as a key corporate strategic issue which was their way of designating the problem as a key and important one. A Peripheral Task Force, headed by H. E. Cooley, Vice President of IBM's Systems Development Division, was created in March 1970. The purpose of this was to examine the competitive threat to IBM of plug compatible suppliers. Judge Christensen found that one of the purposes of this was to study and recommend plans and product strategies to impede the growth of IBM's plug compatible competition and further found that the task force made in-depth analyses of various plans and product strategies, each having as a significant purpose containment and retardation of the growth of IBM plug compatible competitors.[3]
 
 
 33
 In response to the market erosion problem, IBM first produced the Mallard Project announced on September 23, 1970, as IBM's 2319A disk storage facility for the 145 system 370 computer. The court apparently construed this effort as the launching of a so-called fighting ship even though IBM considered it a competitive effort responsive to competitors' inroads. The court looked at it, however, as being specifically designed to contain plug compatible disk competition and to maintain control of the plug compatible disk market for IBM. It was characterized as unlawful, predatory conduct.
 
 
 34
 The product which IBM had before the 2319A was the 2314 disk drive, but its competitors had developed a 2314-equivalent disk drive, plug compatible with IBM's central processing unit. They were marketing it at a substantially cheaper rate than an IBM 2314.
 
 
 35
 The IBM 2314 disk drive was produced in three basic configurations or 'boxes'; the 2312, a box containing one 2314 disk drive; the 2318, a box containing two disk drive spindles; and the 2313, a box containing four disk drive spindles. The 2319A was basically a 2313 box with one 2314 spindle removed, leaving a three-spindle box. Unlike the 2312, 2313, or 2318, or the competitors' plug compatible equivalents, the 2319A could only be connected to the IBM System 370 CPU through an integrated file adapter (IFA) built into the CPU itself, rather than through the formerly used external disk control unit. Except for this difference in the way it was connected to the CPU (at that time not duplicated by IBM's competitors), the 2319A was the functional equivalent of three 2314 disk drive spindles; that is, a 2312 box and a 2318 box.
 
 
 36
 The 2319A using the integrated file adapter was priced substantially below either the IBM three-spindle configuration having the external disk controller or the non-IBM plug conpatible three-spindle unit. The total rental for the 2319A was $1,550 as compared with a monthly charge of $1,420 for the old external control unit plus $1,455 for three 2314 spindles, a total of $2,875. Not only did this furnish an incentive for use of the 2319A rather than the older IBM disk configurations, it furnished an incentive for utilization of the 2319A rather than the competitors' plug compatible equivalents to the 2314, since it was priced below the price then being offered by IBM's plug compatible competitors, including being $100 per month per spindle below Telex's current price for equivalent disk drives. However, the 2319A price was not below production costs and IBM anticipated profit on the item to be in excess of 20 per cent.[4]
 
 
 37
 Following the announcement of the 2319A program in September 1970, a second peripheral task force was organized in October 1970 to further analyze competitors in the plug compatible disk drive area. The analysis included Telex which was determined to be a viable and aggressive competitor, although its manufacturing costs were 10 to 15 per cent above IBM's. It is to be gleaned from the trial court's Finding 80 that Telex's greatest problem was the impact of IBM which thereby shortened product lief. The task force determined that Telex and Memorex were IBM's biggest competitors in the plug compatible disk drive area. It studied likely impact on these two companies of various possible price cuts, forecasting the price reactions which Telex and Memorex could be expected to make and the impact of such price cuts on the profits and revenues of Telex and Memorex.
 
 
 38
 On December 14, 1970, the 2319B merchandising program was announced. This enabled price cuts which were not possible with the 2319A to be extended to a larger body of users having the IBM system 360 computer. The 2319B was a box containing three 2314 disk drives, utilizing an external disk controller designed for 2314 units being attached to the CPU rather than using the internal IFA controller to which the 2319A had to be attached. Here again the prices were reduced in a very substantial amount, an amount which was below any of its plug compatible disk competitors. Although this price cut was not below cost, the court found that it did not represent any technological advance over former 2314 configurations, and it also found that it was a predatory action which was designed to maintain for IBM a 94 per cent share of the plug compatible disk drive market which it controlled at the time of the announcement.[5]
 
 
 39
 In December 1970, according to the finding of the court (undoubtedly this is supported by the evidence), IBM eliminated its 'additional use' charges on all disk drive devices (Numbers 2314, 2319 and 3330). This amounted to a further price reduction on IBM disk drives.
 
 
 40
 The court found that the 2319A and B programs affected the profits of IBM's competitors, but they nevertheless were able to respond. They made price cuts and adopted marketing techniques which resulted in continuing erosion of IBM's market share. Telex's volume increased substantially from November 1970 to December 31, 1972. Indeed, IBM maintains that Telex actually increased its profits over a forecast of some $14 million.
 
 
 41
 Thus, the court's characterization of IBM's 2319A and B programs as being predatory was based on the court's view of the intent with which these were carried out rather than on the actual results which were achieved.
 
 The Long-Term Leasing Plans:
 
 42
 The trial court also concluded that IBM's Fixed Term Leasing Plan together with its Extended Term Leasing Plan announced in May 1971 and March 1972, respectively, also constituted predatory conduct violative of the antitrust laws. However, IBM maintains that its leasing plans were lawful competitive responses to the leasing plans which were then being offered by most of its competitors.
 
 
 43
 Although the trial court characterized the leasing plans as being predatory, at the same time it recognize that IBM was facing the loss of considerable systems and peripheral business and that some such plan was necessary. The court also recognize that these leasing plans were not per se invalid; that they might in a different context have been justified. But the court in Finding 88 expressed the viewpoint that these long-term leasing plans were invalid in the light of IBM's dominant market position in the plug compatible business. DP The IBM Fixed Term Plan provided a 15 per cent reduction in purchase price plus one and two year leases on certain IBM disks, tapes, and printers, with an 8 per cent monthly rental discount for one year leases and a 16 per cent discount for two year leases. It provided stringent penalties in the event of termination. The termination of a two year lease during the first twelve months brought about a penalty of five times the monthly rental charge; the termination of a one year lease or of a two year lease during the second year caused a penalty of two and one-half times the monthly rental charge. Nevertheless, the Fixed Term Plan reduced IBM's prices substantially. However, Telex's prices were actually lower than those of IBM because Telex often bargained concessions which reduced the prices below their lists.
 
 
 44
 IBM's Fixed Term Plan leases involved plug compatible peripheral products competing with plug compatible product equivalents.
 
 
 45
 The chief executive officer of IBM, Mr. Carey, testified that the peripherals were subject to the fixed term plan because of the necessity for either reducing prices or going out of business 'and so they were logical candidates . . .' But in June 1971, IBM's competitors controlled only 14.5 per cent of the disk market and 13.7 per cent of the tape market plug compatible with IBM's central processing units.
 
 
 46
 One of the contentions of Telex (argued in its brief) is that all of the tapes, disk drives, printers, and controllers included in the Fixed Term Plan were those which were subjected to plug compatible competition. Those items which were not subjected to plug compatible manufacturer competition were not included in the Fixed Term Lease program. Thus, Telex concludes that it was a strategy which was designed to destroy the competition.
 
 
 47
 Events Preceding or Leading Up to the Long-Term Leasing Plan:
 
 
 48
 IBM's 2319B program which was announced December 14, 1970, failed to retard the growth of the IBM plug compatible competition during the first quarter of 1971. After the announcement, Telex and the other plug compatible manufacturers had reduced their own prices below the IBM 2319B price. So at the first meeting following the lowering of prices by the other equipment manufacturers, a study was undertaken of possible alternatives to the rental plan of IBM. During the year 1971 the competitors installed 3,006 spindles equivalent to IBM's 2314. In ensuing months even more were installed.[6] The Management Committee studying the problem estimated that IBM could lose over one-half of its lease base in the disk drive market and could lose up to 20 per cent of its tape lease business to its competitors and that by 1976 it could lose 1,500 printers to Telex.
 
 
 49
 During this period of time, Telex was gaining considerably in connection with the plug compatible printers and Telex offered a price advantage in that their product could be used without limit.[7]
 
 
 50
 It was also pointed out in the District Court's findings that in 1970 and 1971 the then national recession together with inflation had a severe effect on IBM. At that time IBM offered its equipment either for outright sale or for lease on short-term leases cancellable on thirty days' notice. Due to the economic situation, many of IBM's rental customers were returning their equipment. The competitors, however, were not experiencing this because their equipment was leased for longer periods of time and with termination charges in the event of cancellation. Furthermore, the competitors' prices were lower and this placed even more pressure on IBM's leasing business. Consequently, IBM's sales of EDP were down 50 per cent in 1970 and were the worst in its entire history in 1971.
 
 
 51
 In the first quarter of 1971, a study was prepared of the plug compatible competition by a Mr. Whitcomb of IBM, who concluded that the plug compatible manufacturing was growing in volume and scope and that this posed a serious threat to IBM's leasing of peripheral equipment. It was estimated that by 1976 IBM would lose 19 per cent of the plug compatible tape market and 28.8 per cent of the plug compatible disk market.
 
 
 52
 The evidence also showed that notwithstanding the 2319 price cuts, Telex was still a strong competitor. Based on all of this, IBM promulgated a policy to do what was necessary in order to swallow whatever financial pills were required in order to reverse the trend so that the business would be in a growth posture. At an IBM meeting held on April 23, 1971, a Blue Ribbon Task Force was appointed. Soon thereafter, the Task Force reported, recommending drastic price cuts amounting to as much as 50 per cent on 2314 and 2420 disk drives, but this was rejected by the Management Review Committee in favor of development of a long-term leasing approach.
 
 
 53
 The Fixed Term Plan was adopted as a result of this (on May 25, 1971).
 
 Effect of the Fixed Term Plan:
 
 54
 The plan called for prices of the competition to be undercut to a considerable extent. At the same time, IBM was to face a reduction in its profits, at least for the first two years. A very considerable increase was contemplated in 1975.
 
 
 55
 IBM's central processing units were not placed under the Fixed Term Plan. Rather, IBM raised its prices on the central processing units during that period of time. The District Court found that IBM's central processing units price increases were designed to offset the decrease on disk, tape, and printer products placed under the Fixed Term Plan. The basis for this finding of the court was an IBM officer's testimony that the net effect of the Fixed Term Plan and price change would be a wash insofar as business volumes were concerned. The District Court was not unaware of the fact that IBM's competitors had offered lower prices for a number of years prior to the Fixed Term Plan in 1971. They also had previously offered long-term lease plans with cancellation penalty clauses similar to the lease plans of IBM.
 
 
 56
 Notwithstanding this, the court considered it necessary to analyze IBM's adoption of a long-term lease program solely in the light of IBM's dominant market position. The evidence was ambivalent as to the reasons which motivated the Management Review Committee's review of the Fixed Term Plan. Nevertheless, the court noted that there was an abundance of documentation concerning the views, computations, studies, forecasts, and recommendations of lower managerial personnel within the IBM organization. The District Court determined that in the absence of full documentation of the intent of IBM officers, it was to be inferred that, in adopting some of the task force recommendations, top management was also embracing the rationale and reasoning underlying those recommendations. The court stated:
 
 
 57
 'Moreover, there is considerable direct evidence on vital points to indicate that top management itself did in fact subscribe to the anticompetitive views and objectives of lower echelons.'
 
 The court concluded that:
 
 58
 'IBM's Fixed Term Plan was generated and implemented at the time it was with the primary intent and purpose of suppressing plug compatible competition and to maintain its monopoly power in the plug compatible disk, tape and printer markets and the general plug compatible market for peripheral devices.'IBM's Fixed Term Plan successfully contained the growth of plug compatible competition in the peripheral device market. After June 1971, the plug compatible manufacturers' share of the disk market remained within 17.5 per cent and its share of the tape market did not exceed 15 per cent. But the competitors made a price reduction in response to the Fixed Term Plans.
 
 
 59
 Despite the response of the competition to IBM's Fixed Term Plan, there was some inability to successfully compete with the IBM Fixed Term Plan. Mr. Rodgers, IBM's Director of Marketing, estimated that the Fixed Term Plan reduced the order rate of the competitors by 50 per cent. The records of IBM establish that 93 per cent of its new disk and tape products were being installed under the Fixed Term Plan and that customer acceptance of it was extremely high (95 per cent).
 
 
 60
 IBM's internal documents described the anticipated consequences of the Fixed Term Plan upon the competition as follows:
 
 
 61
 'The competitor will offer long-term leases similar to IBM's with the base rental initially 10% below ours and declining 5% per year. The competitor will face a new environment; however, in that the bulk of his early installations will represent conversions from PC or IBM 2314's rather than plug for plug replacements of installed 330's. This will be due to the user's reluctance to break the IBM contract due to the penalty payment required. As a result, the competitor will face harder selling and harder installation since he has not yet shown the capability to provide systems, conversion, and application support.'
 
 
 62
 A confidential report issued in December 1971 showed that since the announcement of the Fixed Term Plan there had been a 62 per cent decrease in the competition tape sales rate and in the 4.5 months following the Fixed Term Plan announcement, the competition sales rate for disk drives was off 48 per cent as against the first five months of 1971.
 
 
 63
 IBM's position at trial was, however, that the Fixed Term Plan did not adversely affect the growth of the competition, pointing to the Telex annual report to shareholders of June 18, 1971, as well as to evidence at the trial showing that Telex products had grown substantially during the period in question. IBM also has argued that there were other reasons for the Telex losses, including loss of business to companies other than IBM.
 
 
 64
 A Telex report evidencing an investigation made in March 1972 (by Howard Twilley, an administrative assistant to Telex's Chairman of the Board), said:
 
 
 65
 'The purpose was to determine to what extent IBM's Fixed Term Plan was responsible for cancellations of Telex orders and to make preliminary contact with potential credibility witnesses.
 
 
 66
 'Of twenty customers surveyed, only three admit that FTP was a significant factor influencing their decision to cancel Telex in favor of IBM. Furthermore, these three list other reasons in conjunction with FTP . . . No one indicated a willingness to be a witness although this point was not pursued vigorously for fear of damaging future customer relationships.
 
 
 67
 'Additionally, this may be a dangerous approach since IBM could probably produce witnesses to the effect that no FTP agreement was signed because the customer knew that Telex would be offering an IBM replacement in the near future, probably at less cost. Survey found that Thiokol Chemical took a monthly lease on IBM 3420's and that Amoco Production did the same in anticipation of replacing them with Telex 6420's.' (DB 117; E 2886--2887).
 
 
 68
 In March 1972, IBM announced its Extended Term Plan, a variation of the Fixed Term Plan. Notwithstanding this, Telex's volume of installations rose remarkably following both the promulgation of the Fixed Term and extended Term Plans. IBM also maintains that the trial court ignored its own findings when it found predatory conduct in IBM's long-term leases. These findings were to the effect that:
 
 
 69
 1. The terms of the IBM long-term leases were reasonable and were commonplace commercial agreements.
 
 
 70
 2. The leases actually reduced IBM's costs.
 
 
 71
 3. Prior to IBM's Fixed Term Plan announcement, most of IBM's competitors had similar lease plans.
 
 
 72
 4. IBM's leases were shorter than the mandatory leases which had been judicially approved, notwithstanding that the lessor had been determined to be a monopolist.
 
 The IBM File Adapter:
 
 73
 The trial court rejected Telex's claim that the reduction of the price by IBM of its integrated file adapter for 3330 disk drives constituted a tying arrangement between the file adapter and the 370/135 central processing unit. A particular complaint was focused on the fact that the integrated file adapter or controller could be purchased at a lower price than the independent one. The basis for the trial court's rejection of Telex's contention was that there existed ample evidence to show that the integration represented a valid technological innovation at a decreased cost and that there was no apparent predatory intent.
 
 The Integrated Memory:
 
 74
 The court took a like view to that which it adopted in connection with the file adapter in holding that the integration of the memory component in the IBM central processing unit 370/158 and 370/168 was an adaptation, the primary purpose of which was to achieve cost and performance improvements made possible by reduction in size of the memory component. The court said that the dominant justification was the more efficient performance and cost reduction.
 
 
 75
 When it came, however, to the FET (Field Effect Transistor) monolithic memory, the court said that the action of IBM in lowering the price of this unit was to erect a barrier to entry of competitors in this particular area. Documents of IBM showed that as early as 1968 IBM recognized that the competition had begun offering memories at a price substantially lower than the IBM price.
 
 
 76
 A study force had examined the problem in 1969--70 and had concluded that the competition would become viable unless IBM's rental price were below $6,000 per megabyte of FET memory. Subsequently, a memory task force was formed in March 1971 to develop a strategy in conjunction with IBM's announcement of its two new CPU's, Olympus and Pisces.[8]
 
 
 77
 Prior to the formation of the task force mentioned above, there had been a report of the Management Review Committee in February 1971 which said:
 
 
 78
 'The MC is convinced that memory is our next great exposure. In May 1970, there were five competitive memories installed on our equipment. Presently (nine months later) there are 26 main memories and 33 large core storage memories installed, with 13 on order and over 200 proposed. This is the kind of rapid acceleration which we experienced in the tape and disk area. As you know, peripherals, including memory, is a Key Corporate Strategic Issue and the MC plans to spend considerable time on the subject.'
 
 
 79
 In an earlier Management Review Committee meeting it had been said (by Mr. Carey) that there was not an appropriate technical solution to the problem and, therefore, that repricing was the only alternative available.
 
 
 80
 There was testimony at the trial from a member of the task force studying this, Mr. Hochfeld, that the task force's purpose was to analyze various alternatives open to IBM in order to stem the potential threat from plug compatible memories.
 
 
 81
 A recommendation made in June 1971 to the Management Review Committee by IBM's top executives was to reduce the price of the memory and increase the price of the central processing unit accordingly. This viewpoint was reviewed by the Kenyon House Task Force which reached a similar conclusion, in other words, recommending that the rental price for memory be reduced and that the rental price for the central processing unit be increased. The announcement made on August 2, 1972, with regard to the new central processing units 370/158 and 370/168 adopted this approach. Thus, memory prices were lowered to $5,200 per month rental per megabyte, this rental being less than the amount a potential competitor would need to charge in order to enter the market. At the same time, the CPU rental prices were raised in a proportionate amount.
 
 
 82
 The trial court found that the central processing unit price was raised from $20,600 to $30,700 on the new units, a price which the court also found to be higher than the amount necessary to reflect improvements. On the 370/168, the raise was from $36,400 for the prior model to $48,600 on the new one which also constituted an increase which did not accurately reflect the improved performance.
 
 
 83
 At trial Hochfeld testified for Telex that when IBM dropped its memory price to $5,200 rental, it was impossible for a potential competitor to enter the field and to compete successfully with IBM. Unquestionably the increased price of the central processing units coincided with the decrease in the price of the memory units. However, the low rental price on the memory did not prevent Telex and other competitors from entering this market with units designed to rent for prices below the $5,200 per megabyte per month.
 
 
 84
 IBM here contends that the trial court was in error in holding that these price reductions were invalid because the products were new technologically and were forty times smaller than the core memory which plugged into the old unit. The manufacturing cost of this was also smaller. While the court recognized that the price of the new memory unit charged by IBM was based on a 20 per cent profit margin and was therefore reasonable, the court concluded nevertheless that it was predatory.
 
 
 85
 The effort to reverse the court's finding is based on its alleged failure to take cognizance of the fact that the product was a new one which was much more efficient than the old and that the studies which predicted the impossibility of competitors entering the market were based not on the new technology but, rather, on the old more expensive core memories. In actuality, the evidence of IBM showed that Telex could produce these at $2,700 per unit or $8,000 for three units. IBM's further contention is that Telex suffered no actual damage since it was unable to build the memory without illegally obtaining IBM's trade secrets. There were other reasons why, according to IBM, Telex could not produce memories at the times in question inasmuch as they could not get the parts or the material; this was not the fault of IBM.
 
 
 86
 On appeal IBM has continued to argue that its increase of price on the new central processing units was not linked to the reduction of the memory price, pointing out the vast amount of capital which was needed to develop the new central processing units and the very substantial improvement of the new machines over the older units, including many new features, and new and different parts. For these reasons, IBM contends that the prices of both the CPU's and the memories were reasonable, plainly profitable, and independently justifiable.
 
 III.
 
 87
 THE AWARD OF DAMAGES TO TELEX BASED ON ITS COMPLAINT.
 
 
 88
 The original award of damages was in the amount of $359.2 million. However, in the amended opinion this amount was reduced. The court was seeking to correct what it regarded as its original error which was reducing the award after trebling instead of before. The amended award was in the total amount of $259.5 million plus.$1.2 million in attorneys' fees and costs. The particular elements of damage which the court found were:
 
 
 89
 1. $70 million attributable to loss of market share which the court held Telex would have retained had it not been for the illegal acts of IBM.
 
 
 90
 2. $39 million in loss of rental profits which Telex would have earned on its leases had it not been forced to cut prices because of IBM's illegal acts.
 
 
 91
 3. $8.5 million in loss of sales profits which Telex would otherwise have earned on specific sales had it not been forced to lower prices because of IBM's illegal acts.
 
 
 92
 The court's initial figure was adjusted prior to trebling. The adjustments were as follows:
 
 
 93
 1. Reduction of actual damages by $6 million because of the curative effect which would result from the injunctive relief awarded.
 
 
 94
 2. An additional reduction of $17.5 million, representing the 'best available quantification' of advantage obtained by Telex through illegal activities in establishing its market position upon which antitrust damages were initially determined.
 
 
 95
 3. A further reduction of $7.5 million, representing an approximation of further unlawful competitive advantage obtained by Telex through misappropriation of IBM trade secrets, this amount not being quantified in the direct proof of findings, but which the court felt should operate to reduce damages prior to trebling. Reduction of the initial $117.5 million by $31 million resulted in adjusted damages of $86.5 million. The court then trebled this figure under the provisions of 15 U.S.C. § 15, resulting in total damages of $259.5 million.
 
 
 96
 Underlying Theory of the District Court in Its Award of Damage to Telex:
 
 
 97
 Having found and concluded that IBM had violated the antitrust laws, the court awarded damages on the following bases:
 
 
 98
 First, Telex established by a preponderance of the evidence the fact of injury, in that IBM's violations had produced substantial impact to the business of the plaintiffs. The court was satisfied that the impact was sufficient to satisfy plaintiff's burden of proof.
 
 
 99
 Secondly, the court acknowledged that the specific amounts of damages had not been clearly demonstrated by Telex and that the evidence was insufficient to justify the award of the amounts demanded by Telex.
 
 
 100
 Third, the court applied the principle that where a plaintiff has established injury in fact, it need not under the law establish the specific amount of damages with certainty. The court rejected the doctrine or approach that it was necessary to tie damage directly and specifically to antitrust violations in specific amounts. Rather, the court used a broad-gauged approach of fair and reasonable approximation. Due to the complexity of the case, the court noted the impossibility of quantifying the damages in detail. It concluded:
 
 
 101
 '. . . Notwithstanding the difficulty involved, I have found that there is reasonable basis in the evidence to fairly approximate the damages to which plaintiffs are entitled as proximately caused by the unlawful acts and conduct of the defendant.'
 
 
 102
 Fourth, as a justification for its decision, the court stated that its function was similar to that of a jury determining the amount of damages. The court recognized the requirement of Rule 52(a) that the court must make specific findings of fact, but concluded nevertheless that approximations of total damages are more appropriate than detailed and minute findings allocating portions of claims going to make up the finding of the ultimate fact of damage.
 
 
 103
 In utilizing Telex's damage evidence three points were emphasized:
 
 
 104
 (a) That Telex's evidence was good faith information, not prepared merely for the purposes of litigation.
 
 
 105
 (b) That Telex had presented the court with the best information available.
 
 
 106
 (c) That the inability of the court to determine damages specifically was due to the factual complexities which resulted from IBM's violations. Because of this, the court concluded that the burden of the uncertainty had to be shouldered by IBM.
 
 
 107
 The $70 million loss of market share was estimated on the basis that Telex was entitled to receive damages for loss of profits from the market share of plug compatible peripherals which it would have acquired had IBM not interfered (by, according to the court, committing antitrust violations). To determine what Telex's market share might have been, the court relied on two Telex market forecasts. One was prepared in November 1970 and the other on January 12, 1972. The difference between these two forecasts represented the segment of the market share which Telex had lost in the intervening period. At the same time, the court said that these two forecasts should not be given full face value. Telex itself had, according to the court, failed in its efforts through its own fault. Taking this into account, the court awarded damages for loss of market share in the amount of $70 million. The court did not explain how it arrived at this number.
 
 
 108
 The sum of $39 million was awarded to Telex to compensate it for its loss in rental profits because of its having been forced to cut its prices by IBM's reducing its prices. Here again, the court discounted the estimated loss to make an allowance for factors which do not involve IBM's violations of the antitrust laws and came up with the sum of $20 million on rental profits prior to April 1, 1972. The sum of $19 million was attributable to lost rentals reasonably to be anticipated after March 31, 1972.
 
 
 109
 On loss of sales profits, Telex claimed the sum of $11.3 million. This again was prices and hence its profits. The losses included $8.5 million lost profits in a sale to Pepsico, $1.3 million on the Hudson disk transaction and $1.5 million on the Transamerica disk transaction. In response to Telex's evidence, IBM introduced evidence that many other variables other than IBM's activities could have caused a decrease of Telex's profits in these sales. Damages were awarded in the amount of $8.5 million, a reduction from Telex's claim. This again was another approximation.
 
 
 110
 The reductions referred to above in the award prior to trebling were:
 
 
 111
 1. The adjustment of $6 million representing the correct or diminishing effect of the injunctive relief granted against IBM on the damages otherwise recoverable.
 
 
 112
 2. A reduction of $17.5 million representing Telex's trade secret violations against IBM. This $17.5 million involved losses which IBM suffered as a result of Telex's conversion of IBM's trade secrets.
 
 
 113
 The reason for deducting these amounts from the damages on the complaint was that Telex's projected market share upon which damages were based included Telex's competitive advantage derived from misappropriation of trade secrets. The court did not feel that this loss of competitive edge was properly compensable because it was not based on a violation of Telex's legal rights.
 
 
 114
 There was a further reduction in the amount of $7.5 million prior to trebling representing additional unlawful competitive. advantage realized by Telex through misappropriation of IBM's trade secrets. This also was a generalized amount. The court gave no indication as to how it arrived at this.IV.
 
 
 115
 IBM'S COUNTERCLAIM AGAINST TELEX AND THE DAMAGES AWARDED TO IBM.
 
 
 116
 The District Court's findings and conclusions described a pattern on the part of Telex during the whole period in question of manufacturing products which were plug compatible with the IBM central processing units. According to further findings of the trial court, these were almost exact copies of IBM peripheral products. Telex would introduce these on the market to compete with the IBM devices. This practice had been followed by Telex starting in 1966 in the tape drive area and in 1969 in the disk drive area. Telex had also marketed copies of IBM memory and printer devices. These Telex products were priced substantially less than the price of the IBM products. Telex sought to introduce these copies to the market as soon as possible after the IBM products had been introduced.
 
 
 117
 Telex was able to keep abreast of IBM in the production of IBM's copies only by the hiring of employees or former employees in order to ascertain what IBM was doing or planning to do. This pirating of information was carried out by the employment of key personnel capable of developing the Telex technology in IBM peripherals on the basis of IBM designs. There were numerous such employees hired by Telex. The District Court stated that the number of IBM employees so hired was not statistically significant, but the employees who were hired were key personnel.[9]
 
 
 118
 The court said that the IBM employees had furnished an important and vital part of Telex technology and development. The court then went on to say that in March 1970, for example, Telex hired Jack James, who possessed substantial confidential information about IBM's future production plans. He had been approached by an employee of Telex regarding the possibility of resigning from IBM and taking a position with Telex. The court went on to find that James had access to confidential data relating to IBM products under development. He was furnishing information to Telex even while on IBM's payroll. The court in Finding 138 outlined the various IBM products that James had had access to and delivered to Telex. These included confidential information concerning IBM products under development and its future plans and forecasts, especially as to IBM's Plan 25 Forecast and its SCAN Forecast. James copied large amounts of information from IBM confidential documents and delivered this to Telex when he arrived there. Telex was allowed, as a result, to conform and adjust its production strategy, entering many new production areas and offering a much broader production line in peripherals in 1970 than it had offered in 1969. According to further findings of the court, this constituted deliberate misappropriation by James in violation of his agreement with IBM not to disclose such confidential information. Telex knew that it was confidential and that it had been unlawfully appropriated or should have known. The court further found that Telex officials fully expected and intended James to appropriate this information.
 
 
 119
 One particular item furnished by James was information about IBM's new Aspen 3420 tape drive announced by IBM in November 1970. Based on this information, Telex decided to produce a copy of the Aspen and in furtherance of this hired Howard Gruver, an IBM engineer in charge of the Aspen control unit development project. Gruver, the court found, disclosed IBM trade secrets in violation of his agreement with IBM not to do so, whereby Telex was able to produce an Aspen-type product by November 1971, ten or eleven months, according to the court, sooner than it would have been able to do without the copy and the information. The court determined that the misappropriation resulted in Telex's unjust enrichment in the amount of.$4.5 million in monthly rentals of the Aspen tape units and an additional $3 million in other losses. Other products which were expanded as a result of this kind of practice was the disk file subsystems and IBM Merlin 3330 disk file subsystem which was announced in 1970.
 
 
 120
 In November 1970, Telex hired John K. Clemens, who had been IBM's engineering program manager for the Merlin Project. Clemens was fully informed of the aspects of this program, including the development and design, manufacturing, sales, and forecasts. He was hired for the purpose of developing a Merlin-type disk storage system for Telex. In addition to a substantial salary and stock options, Clemens was given a $500,000 bonus if he produced a Telex Merlin-type system for delivery to a Telex customer prior to November 30, 1972. Telex also set out to hire other key personnel in connection with IBM's Merlin project offering them high salaries, bonuses, and stock options. Telex needed to develop this in eighteen months, a schedule which the court found would have been impossible without the thefts since it had taken IBM five years to develop the project. Telex knowingly and intentionally used the IBM trade secrets and hired a number of new employees in order to bring this about. The court concluded that Telex succeeded in misappropriating IBM's trade secrets and appropriating them into the Telex 6830.[10]
 
 
 121
 The trial court also found that Telex had misappropriated the source code to IBM's 'FRIEND' Version 2 diagnostic program, a coded computerized program utilized in the diagnosis, checkout, and debugging of various devices in a computing system. Necessary to the use of the 'FRIEND' device was the source code. IBM considered it as confidential property and it was secured carefully. The court found that one of the IBM employees hired by Telex took a copy of the source code with him to Telex and that Telex used this misappropriated material in order to develop a Merlin-type disk file system. The court further found that when Telex sold that project to the Control Data Corporation in May 1972, it also sold the 'FRIEND' source code to Control Data for $500,000.
 
 
 122
 The trial court also found that Telex had used the same unlawful conduct and practices in obtaining memory products, communications controllers, and central processing units. However, the court was unable to determine the amount of damages sustained by IBM in these areas or the amount of unjust enrichment to Telex.
 
 
 123
 As to the statute of limitations, the trial court held that it did not apply because Telex had fraudulently concealed the fact that they had misappropriated IBM's trade secrets.
 
 
 124
 The court did find that as a result of Telex's misappropriation efforts IBM was compelled to spend much greater amounts of money for security protection than it would have had to spend had Telex not been misappropriating its secrets. The court determined that the damage to IBM resulting from this was $3 million. Also, the court found that as a direct result of Telex's illegal activities IBM had to itself manufacture certain particularly sensitive products parts; that it was unable to contract out this work. This produced damages to IBM in the amount of $400,000.
 
 
 125
 It was also found by the court that in its misappropriations and related conduct, Telex's conduct was planned, deliberate, and wilful, whereby IBM was entitled to exemplary damages in the amount of $1 million.
 
 
 126
 In Findings 178--187, the District Court detailed the evidence pertaining to Telex's established copyright violations. The court found that Telex had copied all or substantial portions of the IBM manuals dealing with the operation and servicing of IBM's tape drives and tape subsystems, disk drives, tape controllers, and central processing units. After copying these manuals Telex distributed them with its IBM equivalent equipment. All of these manuals were protected by valid copyrights and the portions copied were not trivial.
 
 V.
 
 127
 POINTS ADVANCED BY IBM.
 
 A. Relevant Market:
 
 128
 The main quarrel of IBM with the court's determination of the relevant market is that it is limited mainly to peripheral products plug compatible with IBM's equipment. It encompasses only part of the peripheral equipment marketed by Telex and the other plug compatible manufacturers. It fails to include the peripheral equipment market by systems manufacturers other than IBM.[11]
 
 
 129
 Also, the court zeroed in particularly on these products: tapes, disks, printers, memories, and communications controllers, finding each to be a relevant submarket. Memories are included, notwithstanding that the court regarded them as outside the definition of peripheral products. IBM also complains that although the court found that users of computers can alternate between printers, terminals and computer output microfilm devices, it did not indicate which of these should be included within the printer submarket, and notwithstanding interchangeability between other peripheral devices such as disks and tapes, it failed to include these in the same submarket. It is said from this that the District Court was inconsistent and illogical in defining the relevant market.
 
 B. The Finding of Monopoly Power:
 
 130
 In support of its contention that it did not have monopoly power, IBM cites that its share of the computer systems industry amounted to 35.1 per cent and that its share of computer hardware was limited to 36.7 per cent. Further, that its share of total peripheral equipment was limited to 45.6 per cent of the tape market, 38.3 per cent of the printer market, and 30.3 per cent of the disk and memory market. IBM points out that the court's finding as to the possession of IBM of monopoly power is inconsistent with its findings that there existed substantial competition between IBM and other manufacturers in the area of peripheral products. IBM also complains that the trial court was unfair in including new IBM products which had not yet been copied by other plug compatible manufacturers. Obviously, IBM had 100 per cent of these markets but averaging 100 per cent gives a distorted picture.
 
 
 131
 Finally, IBM maintains that the touchstone of monopoly power is ability to charge unreasonably high prices and to exclude competition. The court did not find that IBM had either of these abilities, although the court did adopt this legal test.[12]
 
 
 132
 IBM also points out that the the object of the Sherman Act is to prevent price fixing, control of supply, and deterioration in quality of the monopolized products. It says that none of these problems exist in the case at bar.
 
 C. Predatory Conduct:
 
 133
 IBM contends that the court erred in finding that predatory conduct existed because it is wholly out of harmony with IBM's lower prices, improved products, and new leasing terms, all of which were responsive to competitive activities and pressures. Attention is called to Findings 88, 95a and 111a, wherein the court admitted that the legality of IBM's responses were competitive, but holds that the conduct was predatory because of the economic power of IBM. It is said that IBM's actions were wholly lawful in themselves, but became unlawful only because of IBM's size.
 
 
 134
 It is said that this view is erroneous because IBM's conduct was lawful, involved a reasonable profit, and was responsive to the acts of its competitors, in harmony with the purpose of the Sherman Act to foster competition and give healthy economic results--better products at lower prices.
 
 
 135
 In details in its arguments the reasons why the 2319 product price offerings were not predatory and why the longterm leases were not, and also why the new memory at a lower price was not predatory.
 
 D. The Award of Damages:
 IBM contends:
 
 136
 1. The awards are vague and are not founded on specific findings. Therefore, they do not comport with Rule 52(a).
 
 
 137
 2. There is no effort on the part of Telex to prove that any activity of IBM caused the damage or that it was the probable consequence of IBM activity.
 
 
 138
 3. The difference between the original award and the amended one illustrates the arbitrary and speculative approach that the court employed.
 
 
 139
 4. It failed to prove particularly that the award to Telex for inability to produce and sell memories was based on anything that IBM had done or had failed to do.
 
 
 140
 5. The future losses recognized by the court were wholly speculative.
 
 VI.
 
 141
 TELEX'S CROSS-APPEAL CONTENTIONS.
 
 A. Appropriation of Trade Secrets:
 
 142
 1. Telex claims that the court erred in its award of damages based upon the misappropriations because it derives largely from the hiring of former IBM employees and the paying of large bonuses to them to produce copies of IBM products. It is said by Telex that the damages which the court found amounting to $20.9 million is based largely on circumstantial evidence.
 
 
 143
 2. Telex says that it did not invade IBM's rights because they were free generally to copy those products that were on the market and thus in the public domain. Further, that these were not secrets; that they were known throughout the industry and neither innovative nor novel. Finally, they maintain that IBM was misusing their secrets in any event; that they were furthering their monopolistic activities with them and therefore the secrets were so contaminated that no recovery could be allowed.
 
 
 144
 3. A specific objection is raised as to the.$4.5 million lost on tape rentals and $3 million in indeterminate damages. Telex says that there is no way of knowing whether IBM would have had the.$4.5 million and says that the $3 million award is too vague.
 
 
 145
 4. Regarding the award of $10 million to IBM based on misappropriation of trade secrets growing out of IBM's Merlin disk system, Telex says that it abandoned this matter midway in its development and sold it to another corporation. Since it never finished its program, IBM did not suffer any damages. It says that the $10 million award really represented the sum that Telex would have lost in its attempt to copy Merlin had it not used IBM's trade secrets. It says that it was impermissible for the court to use this kind of an approach to the award of damages.
 
 
 146
 5. Telex contends that the award of $3 million to IBM for increased security expenses and the award of $400,000 resulting from having to manufacture a component in-house due to fear of misappropriation were ill-founded awards. It says that it should not be penalized for IBM's apprehensions about security.
 
 
 147
 6. Telex also contends that it was error to award the punitive damages. It argues that the award is inappropriate in view of the IBM antitrust violations.
 
 VII.
 
 148
 CONSIDERATION OF THE ISSUES.
 
 1. The Relevant Market
 
 149
 The threshold issue is whether the court erred in its findings as to the scope and extent of the relevant product market for determination whether there existed power to control prices or to exclude competition, that is, whether there was monopoly power. As heretofore pointed out, the court determined that the relevant product market was limited to peripheral devices plug compatible with IBM central processing units together with particular product submarkets; magnetic tape products, direct access storage products, memory products, impact printer products and communication controllers, all of which were plug compatible with an IBM CPU. IBM had sought a determination that the relevant product market consisted of electronic data processing systems together with the products which are part of such systems or at least that the relevant product market should consist of all peripheral products and not be limited to those currently attached to IBM systems.
 
 
 150
 The trial court's initial approach to the problem was restricted to consideration of whether the market 'may be realistically subdivided in the time frame 1969--1972 to focus on and encompass only those parts of current product lines which are respectively attached to IBM systems rather than all those products which actually have similar uses in connection with other systems.' The court recognized that inasmuch as every manufacturer, originally at least, has 100 per cent of its own product, including the peripherals, the likelihood of finding monopolization in this area increases as the circumscribing products market is more circumscribed.[13]
 
 
 151
 The trial court also recognized that the cost of adaptation of peripherals to the CPUs of other systems is roughly the same with respect to every system, that is, the cost of the interface, the attachment which allows the use of peripherals manufactured by one system to be used on another central processing unit is generally about the same. But these practical interchange possibilities did not deter the court in reaching a conclusion that the products market was practically restricted. A factor which influenced the trial court was the commitment of Telex to supplying peripherals plug compatible with IBM systems. The court appeared to disregard the interchangeability aspect of the peripherals manufactured by companies other than IBM, giving emphasis to the fact that Telex, for example, had not chosen to manufacture such peripheral products of the kind and character manufactured by companies other than IBM.[14] The trial court did, however, recognize the presence of interchangeability of use and the presence of cross-elasticity of demand. The court thought, however, that the presence of these factors were not sufficiently immediate.[15]
 
 
 152
 We recognize that market definition is generally treated as a matter of fact and that findings on this subject are not to be overturned unless clearly erroneous. Our question is, therefore, whether it was clearly erroneous for the court to exclude peripheral products of systems other than IBM such as Honeywell, Univac, Burroughs, Control Data Corp. and others, together with peripheral products plug compatible with the systems and, indeed, whether the systems themselves manufactured by the companies are to be taken into account. It is significant, of course, that peripheral products constitute a large percentage of the entire data processing system, somewhere between 50 and 75 per cent.[16]
 
 
 153
 Inasmuch as IBM's share of the data processing industry as a whole is insufficient to justify any inference or conclusion of market power[17] in IBM, the exclusion from the defined market of those products which are not plug compatible with IBM central processing units has a significant impact on the court's decision that IBM possessed monopoly power.
 
 
 154
 We then must inquire whether this market definition was correct in light of the following factors:
 
 
 155
 1. Should peripheral products not plug compatible with IBM systems be considered part of the relevant market in view of the existence of easy and practicable interchange of these products by use of interfaces designed for this purpose?
 
 
 156
 2. Should not the peripheral products plug compatible with systems other than IBM be considered part of the relevant market because of the admitted competition existing as between system manufacturers on a system by system basis in which the peripherals are a significant part of the system?
 
 
 157
 In dealing with the issue whether peripheral products non-compatible with IBM systems ought to be considered, the court said in Finding 47 that as a practical matter there is no direct competition between IBM peripherals and the peripherals of other systems manufacturers. However, this finding is out of harmony with other findings which the court made. See, for example, Finding 38, wherein the court said that 'It cannot be gainsaid that indirectly at least and to some degree the peripheral products attached to non-IBM systems necessarily compete with and constrain IBM's power with respect to peripherals attached to IBM systems.' The court also stated in Finding 38 that:
 
 
 158
 '. . . (S)uppliers of peripherals plug compatible with non-IBM systems could in various instances shift to the production of IBM plug compatible peripherals, and vice versa, should the economic rewards in the realities of the market become sufficiently attractive and if predatory practices of others did not dissuade them. In the absence of defensive tactics on the part of manufacturers of CPU's, the cost of developing an interface for a peripheral device would generally be about the same regardless of the system to which it would be attached, and such cost has not constituted a substantial portion of the development cost of the peripheral device.'
 
 
 159
 The factor of ease of designing interfaces to allow interchange of peripherals was obviously troublesome to the court and this trouble continued after the court had rendered its decision. He was still treating the issue on October 17, 1973, in the posttrial hearing. See Court Papers, 445--446. The court's final words on the subject were:
 
 
 160
 'I'm down to the edge lawn, and I think the best service I can do is to speed the matter to that final determination. If I'm wrong on my market definition, then you did what you had a right to do.'[18]
 
 
 161
 In essence, this witness said that the engineering costs of developing interfaces was minimal and that he had advocated modifying interfaces so that Telex products could be used with systems other than IBM. Another example of ease of interface design is shown by the fact that following RCA's decision to abandon the computer systems business and turn it over to Univac, Telex recognized a marketing opportunity and it began marketing its 6420 tape unit, the plug compatible equivalent of IBM's 3420 Aspen tape unit, as a plug compatible unit with RCA CPUs. The documents sought to emphasize the ease of use in the RCA system of this peripheral equipment designed for IBM equipment originally.
 
 
 162
 Still another exhibit in the record recognizing the practicability of interface change on peripheral equipment is a February 4, 1972, memorandum of R. M. Wheeler, Chairman of the Board of Telex, requesting a letter or his signature which could be sent to systems manufacturers. This letter was to be sent to systems manufacturers. It offered to sell peripheral equipment plug compatible with the central processing units of the manufacturers. Specific reference was made to the 6420 tape unit, among others, which would normally be compatible to IBM's central processing unit. The Wheeler letter stated that Telex would be willing to interface their equipment at no cost to the purchaser.[19]
 
 
 163
 Manufacturers of peripherals were not limited to those which were plug compatible with IBM CPUs. These manufacturers were free to adapt their products through interface changes to plug into non-IBM systems. It also followed that systems manufacturers could modify interfaces so that their own peripheral products could plug into IBM CPUs. Factually, then, there existed peripheral products of other CPU manufacturers which were competitive with IBM peripherals and unquestionably other IBM peripherals were capable of having their interfaces modified so that their peripheral products would plug into non-IBM's CPU.
 
 
 164
 The fact that Telex had substantially devoted itself to the manufacture of peripheral products which were used in IBM CPUs and which competed with IBM peripheral products cannot control in determining product market since the legal standard is whether the product is reasonably interchangeable.
 
 
 165
 This standard was laid down by the Supreme Court in the famous case of United States v. E. I. DuPont de Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). In this case, as in the case at bar, the scope of the products market was crucial. The Supreme Court determined that if one product may substitute for another in the market it is 'reasonably interchangeable.' It was applied there even though DuPont largely controlled the production of cellophane. It was held to be not guilty of monopolization simply because the relevant market included cellophane as well as other flexible wrapping materials. On this the Court stated:
 
 
 166
 '(W)here there are market alternatives that buyers may readily use for their purposes, illegal monopoly does not exist merely because the product said to be monopolized differs from others. If it were not so, only physically identical products would be a part of the market.' 351 U.S. at 394, 76 S.Ct. at 1006--1007.
 
 
 167
 One evidence of cross-elasticity is the responsiveness of sales of one product to price changes of another. But a finding of actual fungibility is not necessary to a conclusion that products have potential substitutability. In this respect the Court said:
 
 
 168
 'Every manufacturer is the sole producer of the particular commodity it makes but its control in the above sense of the relevant market depends upon the availability of alternative commodities for buyers: i.e., whether there is a cross-elasticity of demand between cellophane and the other wrappings. This interchangeability is largely gauged by the purchase of competing products for similar uses considering the price, characteristics and adaptability of the competing commodities.' 351 U.S. at 380, 76 S.Ct. at 999.
 
 
 169
 The Court's further rendition of examples clarified its ruling:
 
 
 170
 'Determination of the competitive market for commodities depends on how different from one another are the offered commodities in character or use, how far buyers will go to substitute one commodity for another.'
 
 
 171
 The Court then turned its attention to the analogy of building materials and said:
 
 
 172
 'For example, one can think of building materials as in commodity competition but one could hardly say that brick competed with steel or wood or cement or stone in the meaning of Sherman Act litigation; the products are too different. . . .'
 
 The Court continued:
 
 173
 'On the other hand, there are certain differences in the formulae for soft drinks but one can hardly say that each one is an illegal monopoly.' 351 U.S. at 393, 76 S.Ct. at 1006.
 
 
 174
 It is helpful to consider the rulings of lower courts based on the DuPont decision. An example is United States v. Charles Pfizer & Co., 246 F.Supp. 464 (D.C.N.Y.1965), where the court applied the ruling of DuPont that complete identity of use is not a prerequisite to a finding of interchangeability. The Government had argued that the defendant had a monopoly in the citric acid market. The record, however, disclosed that citric acid was in competition with lactic acid, tartaric acid, phosphoric acid, and fumaric acid in its uses in the food and beverage industry. Since these different products were functionally interchangeable, the court decided that the relevant market included all such acidic products, and on that account the Government was held to have not proven that the relevant market was solely the citric acid market.
 
 
 175
 In still another case, Advance Business Systems & Supply Co. v. SCM Corp., 287 F.Supp. 143 (D.C.Md.1968), the plaintiff sought to establish that the relevant market was restricted to the paper used in SCM machines, but the court delineated the product market in much broader terms:
 
 
 176
 'When SCM introduced its first machine it had a natural monopoly for a few months of the sale of paper and other supplies for use with that machine. But competition quickly developed for the sale of paper, and by 1965 for replenisher. The evidence shows that SCM has attempted by various means to keep for itself the sale of paper for use in its own machines. If paper for use in SCM machines is a relevant market, which one may attempt to monopolize in violation of section 2 of the Sherman Act, SCM has made such an attempt. But the facts in this case do not show that the relevant market should be defined in such unrealistically narrow terms. The relevant submarket is the sale of coated paper for use in SCM and other machines which employ the direct electrostatic process.' 287 F.Supp. at 153--154. (Emphasis added)
 
 
 177
 So here again the relevant product market included not only SCM's paper but also paper manufactured for use in other machines inasmuch as these products were reasonably interchangeable within the meaning of the DuPont case.
 
 
 178
 In South End Oil Co. v. Texaco, Inc., 237 F.Supp. 650 (D.C.Ill.1965), the court found that there was no monopolization and again on the basis that the product market as defined by the plaintiff was too limited. The court said that where commodities are competitive and reasonably interchangeable, the relevant market is not to be confined to the products of one manufacturer.
 
 
 179
 One of the most significant decisions of all is that of the Supreme Court in United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). In the opinion of Mr. Justice Douglas who had dissented in DuPont, the DuPont case is cited approvingly. The opinion recognizes that substitute products are to be included within the definition of relevant market 'since customers may turn to them if there is a slight increase in the price of the main product.' 384 U.S. at 571, 86 S.Ct. at 1704. The relevant market in Grinnell was broadly defined and included the entire accredited central station service business involving such systems as automatic burglar alarms, automatic fire alarms, aprinkler supervisory service, and watch signal service. The basis for combining these various products was that all of them provided protection of property.
 
 
 180
 The consequences of the Court's holding are very clear; there can be no ruling of monopolization where the issue is judged on the basis of the entire market rather than a small segment of it. See the decision of the Fifth Circuit in Cliff Food Stores, Inc. v. Kroger, Inc., 417 F.2d 203 (5th Cir. 1969). In footnote 14 the court said that the essence of monopoly is that 'power exists to raise prices or to exclude competition when it is desired to do so.' American Tobacco Co. v. United States, 1946, 328 U.S. 781, 811, 66 S.Ct. 1125, 1140, 90 L.Ed. 1575. The court went on to say that:
 
 
 181
 '. . . It appears that something more than 50% of the market is a prerequisite to a finding of monopoly. See, e.g., Standard Oil Co. v. United States, 1911, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (90%); United States v. Paramount Pictures, Inc., 1948, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (70%); and United States v. Grinnell Corp., 1966, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (87%). . . .'
 
 
 182
 It seems clear that reasonable interchangeability is proven in the case at bar and hence the market should include not only peripheral products plug compatible with IBM CPUs, but all peripheral products, those compatible not only with IBM CPUs but those compatible with non-IBM systems. This is wholly justifiable because the record shows that these products, although not fungible, are fully interchangeable and may be interchanged with minimal financial outlay, and so cross-elasticity exists within meaning of the DuPont decision.
 
 
 183
 The court's very restrictive definition of the product market in the face of evidence which established the interchangeable quality of the products in question, together with the existence of cross-elasticity of demand, must be regarded as plain error.
 
 
 184
 2. The 'Acts' of IBM.
 
 
 185
 If it be assumed that IBM had monopoly power during the period under consideration, which we do not decide, but the trial court so found, and further, that this position had been lawfully attained, also as the trial court found, were the changes in marketing methods under such conditions made by IBM lawful? The trial court found they were not. These changes were price reductions and leasing of equipment under fixed term leases and extended term leases.
 
 
 186
 The fixed term leasing will be first considered and excerpts from the Findings of Fact and Conclusions made by the trial court will be used in part to describe the leases and their use.
 
 
 187
 IBM announced a new marketing plan in May 1971. This was the leasing of peripheral units, not central processing units, for a fixed term of years rather than on its old lease which permitted the user to cancel on thirty days' notice. Comparable 'Extended Term Leases' were instituted thereafter.
 
 
 188
 Of the economic conditions existing at the time, the trial court found:
 
 
 189
 'F89a. In 1970 and 1971 IBM experienced the effects of a nationwide recession combined with inflation, which caused a substantial increase in the level of returns and discontinuance of its EDP equipment including peripheral equipment. IBM at that time offered equipment only on short-term leases or for sale; its rental customers could effectively return their equipment to IBM on 30 days' notice. As a result of the economy, many of IBM's rental customers took advantage of this privilege and returned a significant amount of equipment to IBM. IBM's experience was not shared by its leasing company, systems manufacturer or peripheral equipment manufacturer competitors, since their equipment was generally leased for terms of one, two or more years, with termination charges or other costs in the event of cancellation. Another factor affecting IBM's business in this period was the increasingly lower rental prices charged by leasing companies and peripheral equipment manufacturers for equipment similar to IBM's. As a consequence of these factors, IBM's sales force in 1970 achieved only 50% of its selling objective. In 1971, IBM experienced the worst sales record year in its history for EDP equipment.'
 
 Also part of F88:
 
 190
 'In view of the fact that most of IBM's systems manufacturer, leasing company and peripheral equipment manufacturer competitors were offering long term leases by the Spring of 1971 (Finding F100), IBM expected to, and was likely to, continue to lose substantial systems and peripheral business unless some plan was adopted.'
 
 The court continued in a conclusion:
 
 191
 'C29. Agreements reached under IBM's fixed term and extended term plans are commonplace commercial agreements fixing the terms and conditions upon which users may lease some equipment for periods of up to two years. The terms of these leases are limited to provisions governing the use of the particular equipment under lease. They impose in and of themselves no restraints on the freedom of the lessee to trade. They do not obligate the lessee to any exclusive dealing arrangement. They do not obligate the lessee to purchase its requirements of the electronic data processing equipment, supplies or services from IBM. The term of leases contain no 'restraints' of the kind traditionally found violative of Section 1 of the Sherman Act. The terms of the leases are shorter than leases which had been offered by IBM's competitors, including plaintiffs, for some time prior to IBM's adoption of the fixed term and extended term plan. In a different context, the court in United States v. United Shoe Machinery Corp., 110 F.Supp. 295 at 297 (D.Mass.1953), aff'd per curiam, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954), supra, expressly sanctioned the use of five year term leases despite its conclusion that defendant had monopolized the market for shoe machinery. The court concludes that the leases offered by IBM pursuant to the fixed term and extended term plans are not contracts in restraint of trade violative of Section 1 of the Sherman Act.'
 
 
 192
 The trial court at the end of its conclusion C28 said:
 
 
 193
 'I have concluded that the leases in question would not be unlawful without the monopoly power held possessed by IBM or the found attempt to monopolize.'
 
 As part of F88 the trial court said:
 
 194
 'Again, there seems little question but that in a different context, or directed to general competition, the leasing plans adopted by IBM might be unexceptional or entirely justified. The question remains, however, whether in the setting of IBM's dominant position in the plug compatible submarkets and in view of the evidence as to its specifically directed intent and concern with reference to the plug compatible competition in those markets, the two leasing plans above-mentioned can be sustained as against Telex's attack.'
 
 
 195
 The trial court concluded (C29) that the leases were 'commonplace commercial agreements,' as above noted, and when the leases were announced, most of the competition had similar leases in effect. Thus the customers had the choice of a lease, rental arrangement, or purchase.
 
 
 196
 IBM's one and two year leases contained a provision that they could be terminated by the lessee before the end of the term upon payment of a specified amount. Thus if a two year lease was ended during the first year, the charge was equal to five months' rental. A charge of two and one-half months' rent was provided for the termination of a one year lease before the end of the term or of a two year lease during the second year. These provisions applied uniformly and regardless of the reason for termination including the substitution of equipment. The leases offered by the competition of IBM also contained provisions for payment in the event the lessee terminated. Also some did not provide for termination by the lessee. (F100 and C29).
 
 
 197
 The trial court made no finding, and no evidence was introduced, as to whether the termination charges represented actual damages IBM would incur upon such a lease termination or whether they were more or were less. Thus no evidence exists to show whether the charges were excessive or not.
 
 
 198
 The trial court found that the leasing of equipment by or the change to a leasing plan was a violation of the Sherman Act. The trial court refers to the Fixed Term Leasing Plan as 'FTP.' Of this leasing plan, the court found (F96):
 
 
 199
 '. . . Defendant's officers at the trial expressed the view that FTP was simply to render the company 'more competitive' and to obtain more business by meeting the competitive efforts on a basis similar to that of plug compatible suppliers. It is the court's view that such justification, which could be convincing under different circumstances, is overpowered by IBM's monopoly position in the particular markets involved and the rather clear indication that its action was directed not at competition in an appropriate competitive sense but at competitors and their viability as such. The products specified by FTP were those peripheral products on which IBM was receiving, or on which it anticipated that it would receive, substantial plug compatible competition.' The court again found some justification for the fixed term plan, but concluded it was illegal. It found in F100
 
 
 200
 '. . . By 1971, most of IBM's competitors, including systems and peripheral competitors and leasing companies, were offering users long term lease options. IBM's studies indicated that a long term lease plan on peripheral products, among other things, would reduce IBM's costs through decrease in 'churning' of IBM's leased equipment at the same time and for similar reasons that its competitive position in relation to PCM's would be enhanced. But preponderant evidence demonstrates that IBM's fixed term plan was generated and implemented at the time it was with the primary intent and purpose of suppressing plug compatible competition and to maintain its monopoly power in the plug compatible disk, tape and printer markets and the general plug compatible market for peripheral devices.'
 
 
 201
 The leasing plans for peripheral units were only part of the way in which IBM reacted to conditions in the market in 1970. IBM made several studies of its market position, and how it could be improved. Price reductions were announced, and price reductions were also effected in the leasing plans. The pricing changes, and some model changes, came about after IBM management had made detailed study of the peripheral market and of its competitors in this market.
 
 
 202
 The trial court gave considerable attention to the reaction of IBM management in 1970 to the poor sales record of the company for peripheral equipment. These reactions were initiated by the creation of an executive group to study and report on the problem. The record indicates that this was the customary way in which IBM handled serious corporate problems. Thus in 1970 a task force, called the Cooley Task Force, was appointed to study the plug compatible market and to recommend plans to improve IBM's position. This group directed its attention to the products, financial conditions, management, and general viability of its competitors in this market, including Telex. These studies were in some considerable detail.
 
 The trial court in Finding 74 said:
 
 203
 'F74. After the designation of peripherals as KCSI, a task force was formed in March of 1970 to be headed by H. E. Cooley, Vice President of the Systems Development Division. The Peripheral Task Force, or Cooley Task Force, as it became known, met regularly both in formal and informal meetings from the middle of March of 1970 until its report to the Management Committee of IBM on July 31, 1970. The objective of this task force was to examine the competitive threat to IBM of plug compatible suppliers. A Telex trial witness, Richard Whitcomb, who was IBM's manager of I/O Systems Marketing from the fall of 1968 to the summer of 1971, participated in the work of the Peripheral or Cooley Task Force on behalf of the Data Processing Division. A purpose of the Peripheral Task Force was to study and recommend plans and product strategies to impede the growth of IBM's plug compatible competition. The Peripheral Task Force made indepth analyses of various plans and strategies each having as a significant purpose the containment and retardation of the growth of IBM plug compatible competitors. The task force made in-depth assessments of the status of plug compatible competition and analyzed the viability of particular plug compatible competitors, including Telex.'
 
 
 204
 The first corporate action taken thereafter by IBM to carry out the task force recommendations was a repricing and rearrangement of its disk storage device. The disk drive peripheral units of the competition had made serious inroads on IBM's disk drives. The model announced by IBM was 2319A and was a reworked, rearranged version of units previously marketed, and the results achieved were essentially the same as those by the prior units. This 2319A unit used basic components which were available and returned by users. The rental announced for the 2319A was below that charged on the prior units, and was below the Telex price. stThe trial court found:
 
 
 205
 '. . . IBM's price cuts for the 2319A and IFA were not justified upon the basis of reduced manufacturing costs.
 
 
 206
 'F78. IBM may have reduced its cost somewhat through reuse of 2314's which were being returned to IBM because of plug compatible competition, but it is clear from the evidence that any decreased cost was of minor importance or influence in the Mallard plan and that price reduction independent of cost on limited products in competition with plug compatible supliers was the primary purpose of the response. . . .
 
 
 207
 'F79. The 2319A price cut was designed by IBM specifically to contain plug compatible competition. It originated in the Cooley or Peripheral Task Force and was approved by top management. Its primary purpose was to maintain control of the plug compatible disk market for IBM. It was introduced by IBM with the specific purpose and intent of suppressing plug compatible disk competition. IBM admits, indeed argues, that its action was a competitive response necessitated by the inroads of plug compatible competition and that it in fact did not succeed in maintaining IBM's market share. But IBM already possessed a dominant market share, and continues to do so. Notwithstanding lawful acquisition theretofore, its intent to maintain its monopoly by unlawful predatory conduct cannot be equated reasonably with an ordinary competitive response.'
 
 
 208
 The reaction of IBM, and the use of studies of competition continued. As the trial court found:
 
 
 209
 'F80. IBM, in October, 1970, organized a second peripheral task force to analyze plug compatible competitors in the disk drive area. The scope of the task force study included analyzing of the marketing, management, maintenance, production and engineering capability of IBM's plug compatible competitors. The group was directed to study and estimate the announcement and first customer shipment dates on PCM's 3330 equivalents and make a cash flow analysis, including financing arrangements, of PCM's, to make an estimate of the PCM's 2314 manufacturing cost and to determine 'how long can OEM PC suppliers go on 2314 prices?' This group's report concerning Telex concluded that Telex was viable, that its management was competent and aggressive and that it had a strategy of marketing a full line of high volume IBM plug compatible peripherals, that its inhouse engineering capability was good, but that its manufacturing costs were 10% to 15% above IBM's. The Telex analysis concluded that Telex's cash flow was inadequate to permit Telex to finance its own lease base and that Telex's key exposure was 'impact by IBM--shortens product life."
 
 
 210
 IBM made studies of the impact on Telex and Memorex of price reductions of disk drives. The management was contemplating a reduction in prices of such units to be used with another type of its central units. The studies indicated that the reduction would cause a price cut by the two competitors and would have a 'very serious impact' on their profits and revenues.
 
 
 211
 The 2319B project with a rearrangement and repackaging was announced in December 1970 with price reductions. The trial court found that the 2319B announcement 'was purely a price cut to a point below the prices charged by competitors including Telex.' The trial court also found (F84):
 
 
 212
 'The 2319B was designed by IBM as a predatory action contrived to maintain its 94% control of the plug compatible disk market.'
 
 
 213
 IBM further reduced the cost to users by an elimination of extra use charges on all its disk storage devices.
 
 
 214
 The 2319B reductions were followed by price reductions by Telex and others. However, Telex negotiated a 28 per cent price reduction from its supplier for the comparable units. The court found (F86):
 
 
 215
 'After the decrease in Telex disk device prices, the order rate of Telex disk devices again increased significantly.'
 
 
 216
 Telex in the following period shipped more units than it had forecasted it would.
 
 The court, in F89, found:
 
 217
 'IBM's 2319B announcement failed to retain IBM's high share of the plug compatible disk market and failed to contain the growth of IBM's plug compatible competition during the first quarter of 1971. The latter continued to make strong advances with its installation in the 2314 disk drive area.'
 
 
 218
 The court also found that the strength of this competition was spreading to other compatible devices than disk drives.
 
 
 219
 The memory devices underwent a substantial technical change during the period in issue. There were also price reductions on the memory units, and the combination of the units with the CPUs in one 'box.' The older memory unit was a magnetic core unit and the new one based on a different principle was called a FET.
 
 
 220
 IBM had a group organized to plan the strategy for pricing and marketing the FET. The court found that the purpose of the task force was to prevent entry into the market by the competition. The court found (parts of F108 and F107):
 
 
 221
 'F108. . . . The work of this memory task force included an attempt to fix a price for IBM's monolithic FET memories that would influence potential plug compatible competitors to stay out of the market. The IBM Management Review Committee set the monthly rental price for IBM's FET monolithic memory at $5,200 per month per megabyte, which was less than the amount reporting experts had indicated a potential competitor would be required to charge in order to enter the market and be profitable and viable.' (The trial court is in error on this point as it has confused the pricing of the old memory device with the FET device. The $5,200 figure rental price the court mentioned was for the older memory device and not the FET.)
 
 
 222
 'F107. While cost and performance justifications may have existed to an extent, it is found that IBM lowered the price on its FET monolithic memory products and raised prices on its CPU with the primary purpose of creating barriers to entry for potential plug compatible memory competitors. . . .'
 
 The court also found in F108 (part):
 
 223
 '. . . Neither the design of the 370/158 and 370/168 nor the price of $5,200 per megabyte per month prevented Telex from planning competing memory products and in March, 1973, it announced that it would market memory components for 158 and 168 systems. Control Data, Itel, Ampex and Intel have announced memories for IBM's 370/158 and 370/168 systems at prices substantially below IBM's price.'
 
 
 224
 IBM had announced a new memory device based on new technology in August 1972, the FET. This was an entirely new product and management set the price on it. It was incorporated as a part of several new central processing units then being marketed. The unit was some thirty to fifty times smaller than the unit based on different principles theretofore developed for essentially the same purposes. The new unit was also much less expensive, about one-half, as the former unit. In Finding 111 the trial court said of the new type memory unit that performance and cost improvements came about by its smaller size. There was no question but that the FET was a new technological development. The trial court (F110) also found that the pricing of the new device was such that it would return a reasonable profit.
 
 
 225
 The trial court found that four other makers of peripheral products had announced similar memory devices, copies of IBM's, at prices well below the IBM price. The plaintiff indicated it would also market a copy.
 
 
 226
 The Fixed Term Plan Leases of IBM on peripheral products announced in May 1971 provided an 8 per cent discount in monthly rental for one-year leases and a 16 per cent discount on two-year leases. IBM also eliminated the extra use charge on equipment under such leases. The elimination of the extra use charges resulted in a significant total reduction in costs to the customer.
 
 
 227
 The trial court found, referring to all price reductions, that 'the price cuts in some instances put IBM prices below those of its plug compatible competitors.'
 
 As to the pricing by IBM, the court found:
 
 228
 'F111a. There was no evidence that IBM reduced prices below cost and a reasonable profit. Indeed, when announced the profitability of the 2319 disk storage units, the 370/158 and 168 CPU's and CPU memory elements were anticipated to be in excess of 20%. Likewise, at the announcement of FTP it was anticipated that the profitability of the products to which it applied would be at least 20%. Those profit margins in part, of course, would have been achieved by obtaining leases of products which would have otherwise been made by Telex and other PCM's. Those price reductions are found to be predatory.'The fixed term leasing plan of IBM did not cover central processing units. During the price reductions on peripheral units, IBM increased slightly the charges on its central processing units and on such units including 360 memories. The record shows that the central units on which prices were raised were the result of considerable development costs, had improvements incorporated in them, and contained a larger number of parts newly designed. There is no indication that the increase was not reasonable and the trial court did not find it to be otherwise. These prices are within the general finding of reasonable prices. However, the trial court found the increase to have been made to offset the reduction in prices of the peripherals.
 
 
 229
 The following finding of the trial court quoted in part sums up the position it took as to the leasing and pricing. It also demonstrates the emphasis the court placed on the IBM task force studies of competition, and the source of the 'predatory' appellation it used:
 
 
 230
 'F112. IBM'S growth and success in the industry have been due in substantial measure to its skill, industry and foresight. It has tended to set the standard for quality in the EDP industry for products and services. . . .
 
 
 231
 '. . . I therefore cannot fully agree with Telex's contention that 'IBM did not gain, nor has it maintained its position in the industry through skill, industry and foresight.' No doubt it gained a dominant position in the industry through a praiseworthy degree of these qualities. Whether there was anticompetitive conduct that went along with them in recent years prior to 1969, the record does not disclose. The real problem here is notwithstanding this, whether IBM has maintained its monopoly position, or attempted to do so, by unlawful conduct since 1969. In the respects determined here in the critical period at least it must be recognized that its diligence and foresight have included the competitive studies and the anticompetitive objectives and intent heretofore found, and that particularly as applied to this case have included an attempt to substantially constrain or destroy its plug compatible peripheral competition by predatory pricing actions and by market strategy bearing no relationship to technological skill, industry, appropriate foresight or customer benefit. . . .'
 
 The Trial Court's Application of the Law:
 
 232
 The trial court, to the 'acts' of IBM described above, applied a standard it derived from a group of cases it relied upon and quoted from. Its view was summarized in Conclusion 6 which in part is as follows:
 
 
 233
 'C6. I believe the applicable rule to be that monopolization in violation of Section 2 of the Sherman Act involves two elements: (1) The possession of monopoly power in the relevant market or submarket and (2) the willful acquisition or maintenance of that power with intent to monopolize, which intent need not be evidenced by predatory practices but which is not to be gathered merely from growth or development as a consequence of a superior product. (Citations omitted).'
 
 
 234
 The trial court thus took the position in the Conclusion referred to that the cases hold that a market practice or pricing under consideration in these circumstances is improper if it is not a consequence of historic accident, business acumen, or a superior product. In Conclusion 17, the trial court, as to the showing of intent, also said:
 
 
 235
 'It is sufficient that monopoly power is willfully acquired or maintained as distinct from the growth or development as a consequence of a superior product, business acumen or historic accident.'
 
 
 236
 The trial court held that the acts of IBM could not be placed in any of the three exceptions and thus they were illegal. This view of the authorities taken by the trial court is an extremely narrow one, and ignores two factors. The first factor is whether or not the acts are ordinary business practices typical of those used in a competitive market, and secondly whether the acts constitute the use of monopoly power. Thus if a business attained a position of monopoly power by research and technical innovations, can it change to utilize the marketing devices already employed by others in the market, and can it reduce prices not below a point where they will derive a reasonable profit?
 
 
 237
 It is obvious that the reduction in prices by IBM resulted in price reductions by others in the market. These others had in the past priced below IBM as the record shows that Telex was the next below IBM in price levels and the others below Telex. The reduction was a disturbance in the price structure. As to Telex the record shows that it was able to secure substantial price reductions from its suppliers as to some items when this took place. The record also shows that IBM costs were greater than those of Telex and others in the market and the reasons therefor are obvious. After the price reductions by IBM, the trial court found it was nevertheless earning a 'reasonable' profit (F95A also). The competition thus followed the IBM pricing, but this does not appear to be significant in view of the trial court's finding that IBM set the technical and quality standards, and was the leader in the development of new technology and products. After the initial price reaction with a significant loss of orders by Telex it within a relatively short time again recovered and began to increase its share of the market. The trial court so found (F89, F67, F116, F108). Better products and lower prices came about throughout the period under consideration.
 
 
 238
 The trial court did not find nor did it hold that the acts of IBM found to be illegal were derived from its power in the market or its size, nor were they acts which could only have been performed by one with the requisite power. The 'acts' found by the trial court to be illegal were ordinary marketing methods available to all in the market. As to pricing, the trial court found it was used by IBM only to a limited extent, that is, within the 'reasonable' range. The resulting prices were reasonable in that they yielded a reasonable profit. This 'profit' the trial court found to be about 20 per cent. Thus there is no use of price reductions by an economic giant to drop prices to a level where it is not receiving an adequate return and must instead rely on its reserves or other activities to continue producing and marketing the particular product. Instead in the case before us, as demonstrated by the trial court's findings, the particular products of IBM here considered stood on their own feet as to financial returns. Furthermore it was also demonstrated that IBM's costs were above others in the market. From these facts it must be concluded that IBM did not use monopoly power even if it assumed that it possessed such power. The cases relied upon by the trial court all refer to the 'use of monopoly power,' and this is all the law condemns. Again under our assumption IBM gained its market position by technical advances and quality products. The record shows, during the period under consideration, that the parties and others in the market produced more advanced products better suited to the needs of the customers at lower prices.
 
 Use of Monopoly Power:
 
 239
 The Court, in United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236, considered circumstances where the defendant theater operators used their combined monopoly positions in certain towns to gain competitive advantages in other towns where they had no monopoly. The Court referred to the use of monopoly power:
 
 
 240
 'The anti-trust laws are as much violated by the prevention of competition as by its destruction. . . . It follows a fortiori that the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful.'
 
 
 241
 This use of the power to control prices or to exclude competition (United States v. E. I. DuPont de Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264) was there considered to be the basis of the violation.
 
 
 242
 In United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778, there was no issue as to the improper use of contracts and acquisitions both to attain and maintain a monopoly. The Court instead considered only the relevant market problem. In several other cases the 'power' aspect is dominant, as evidenced by United States v. Swift & Co., 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999. There it was stated that size was not enough alone, but gave rise to the opportunity for abuse as therein found. The Court thus held that Swift & Co. had used its size for 'abuse.' We have no finding by the trial court, nor does the record indicate, that this is such a 'power' case, although there are several references to the size of IBM.
 
 
 243
 In American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575, the Court referred to the 'thrust upon' monopoly power mentioned in United States v. Aluminum Co. of America, 148 F.2d 416 (2d Cir.); stated that such a situation did not exist in the case before it, and there was an actual conspiracy. The Court quotes certain passages from United States v. Aluminum Co. of America opinion relating to the exclusion of competition, and notes that there is no real difference between competitors who are put out of business or whether they are prevented from entering the market. These quotations also include references to the requirement under section 2 of the Sherman Act that there be the 'power' to monopolize and the 'intent' to monopolize. The American Tobacco opinion is thus not particularly helpful in this case except as to the acceptance of portions of the Alcoa opinion. The 'thrust upon' category described in Alcoa was there mentioned, but not necessarily endorsed. It has elsewhere been generally recognized and the same or comparable language has been used. However, there is no detailed consideration of the meaning or scope of the several elements mentioned in the context of monopoly power lawfully acquired. The trial court did not do so here. It also held that there were no other exceptions than those mentioned in Alcoa, and no limited action whatever would be permitted outside them by way of ordinary business practices. The 'thrust upon' exception has been more frequently used in reference to the attainment of a monopolistic position than in reference to what one with legitimately acquired monopoly power may do. The element of 'business acumen' in the exceptions has not been defined. If the 'thrust upon' exceptions are adopted, they must be fitted in with the requirement that a 'use' of monopoly power is required. It would be simple to place the 'acts' here under consideration within the 'business acumen' exception, but it is virtually unlimited. However, we do not accept the requirement that the only permitted exceptions, or that the 'thrust upon' shorthand description means that the events or acts must be entirely involuntary. To do so would permit the defendant corporation to do nothing whatever by way of change in marketing. There must be some room to move for a defendant who sees his market share acquired by research and technical innovations being eroded by those who market copies of its products. It would seem that technical attainments were not intended to be inhibited or penalized by a construction of section 2 of the Sherman Act to prohibit the adoption of legal and ordinary marketing methods already used by others in the market, or to prohibit price changes which are within the 'reasonable' range, up or down. Under the unusual market circumstances before us, to so interpret the Act to prohibit such actions is to protect the others in the market from ordinary competition, and was an incorrect interpretation of applicable law.
 
 
 244
 It is necessary to briefly consider the characterization of the above considered marketing changes as 'predatory' by the trial court. The term probably does not have a well-defined meaning in the context it was used, but it certainly bears a sinister connotation.
 
 
 245
 The 'predatory' conclusion was expressed after the trial court had given extended consideration to the creation of 'task forces' by IBM, and the direction of their attention and study to Telex especially and other corporations in the business. The consequences of repricing and the pricing of new products upon competitors was also considered by the trial court to have legal consequences adverse to IBM. The record demonstrates that these acts of IBM are again part of the competitive scene in this volatile business inhabited by aggressive, skillful businessmen seeking to market a product cheaper and better than that of their competitors. To do this, the record shows it was customary for them to study their competitors, all their capabilities, and what may be expected of them when a new product appears on the market. It is IBM's participation in this marketing that the trial court termed 'predatory,' but the record shows this was no more than engaging in the type of competition prevalent throughout the industry. It would not seem necessary to discuss this point at length as it is another manifestation of the conclusions the trial court derived from the 'acts' which we have considered above. This aspect of the case is, for all practical purposes, governed by the opinion in Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277. See also Travelers Insurance Co. v. Blue Cross, 481 F.2d 80 (3d Cir.), and Panotex Pipe Line Co. v. Phillips Petroleum Co., 457 F.2d 1279 (5th Cir.).
 
 
 246
 The 'attempt to monopolize' aspect need not be separately considered.
 
 
 247
 3. IBM's Counterclaim.
 
 
 248
 In its answer to Telex's amended consolidated complaint IBM asserted two counterclaims. The first counterclaim was based on alleged misappropriation by Telex of IBM trade secrets. The second counterclaim was based on alleged copyright infringement by Telex of certain IBM manuals and publications. The judgment entered on the second counterclaim for copyright infringement is not involved in this appeal.
 
 
 249
 As concerns the first counterclaim, the trial court found that Telex had misappropriated IBM trade secrets and in connection therewith granted certain injunctive relief and also awarded compensatory damages in the sum of $20,900,000 and punitive damages in the sum of $1,000,000. The equitable relief granted in connection with the first counterclaim is not involved in this appeal. What is challenged on appeal is the trial court's finding that there was a misappropriation of IBM trade secrets by Telex, and the trial court's award of $20,900,000 as compensatory damages, plus an additional $1,000,000 as punitive damages. Telex's basic approach is that there was no misappropriation of any trade secret belonging to IBM, and that, in any event, the trial court's award of damages was excessive and not supported by the record.
 
 
 250
 In the recent case of Kodekey Electronics, Inc. v. Mechanex Corp., 486 F.2d 449 (10th Cir. 1973), we hewed to the oft-repeated statement, found in the Restatement of the Law of Torts, § 757, Comment b, that a trade secret consists of any formula, patent, device, plan, or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitiors who do not know it. In that case we also noted that generally just what constitutes a trade secret under the above definition is a question of fact for the trial court. Let us briefly examine the trial court's findings regarding misappropriation of trade secrets. In this regard, of course no one testified that he 'saw' Telex misappropriating IBM's trade secrets, nor did any quondam IBM employee admit that he had taken IBM's trade secrets with him to Telex. But, in our view, the facts and circumstances, when viewed in their totality, do permit the inference that there was such misappropriation.
 
 
 251
 The heart of the trial court's findings on the issue of misappropriation is that Telex lured key employees away from IBM with the promise of greatly increased salaries, plus substantial bonuses, and that these quondam IBM employees brought with them IBM trade secrets which enabled Telex to market plug compatibles sooner than it would have otherwise been able to by waiting till IBM equipment hit the open market and by then duplicating the same through reverse engineering. It was this 'head start' or 'lead time' that placed Telex in a better economic position because of its misappropriation of IBM trade secrets. Specifically, the trial court found that the hiring of the IBM employees James, Gruver and Clemens, and the utilization of the trade secrets which each brought with him to Telex, enabled Telex to hit the market sooner than it would have otherwise been able to with Telex's version of the Aspen tape controller, and at the same time substantially advanced Telex's work related to a duplication of IBM's Merlin disc controller. The latter project was apparently terminated by Telex before completion.
 
 
 252
 We do not here propose to summarize all of the trial court's findings on the matter of misappropriation of trade secrets, or to detail the supportive evidence for such findings. As indicated, the trial court made elaborate findings on all phases of this case, and its findings on the counterclaim are numbered 132 to 168, and appear at pages 313 to 328 in its opinion, which in turn appears at 367 F.Supp. 258. These findings speak eloquently for themselves, and it is sufficient here to simply state that our study of the record indicates that the trial court's findings of fact are amply supported by the record.
 
 
 253
 Furthermore, the trial court's conclusions of law clearly indicate to us that the trial court did not misapply the law on the subject. As concerns the trial court's legal conclusion, we refer to the conclusions numbered 44 and 45, which read as follows:
 
 
 254
 'The facts here go beyond the mere termination of employment and the acceptance of employment from a competitor; disclosures to employers of information acquired during the course of previous employment which was a matter of general knowledge or information as it might be retained in memory; the utilization of skills, expertise and general technical and business information learned in former employment; the employment of 'key' employees of a former employer to obtain skills and knowledge in the usual course of business; the obtaining or disclosure of data not confidential or which do not constitute trade secrets reasonably protected by others; information disclosed by the products marketed; the disclosure of information that could not be considered to have been 'discovered'; the disclosure of information readily available from other sources; or matters which are generally known in the trade or readily discernible by those skilled in the trade, and such circumstances.
 
 
 255
 'The trade secrets or confidential information found here clearly fall within the definition of formula, patterns, business plans, compilations of information or technical knowledge which were used in IBM's business, which were important in that business, which were treated and sought to be protected as confidential to IBM for the purposes of its business, and which entitled IBM legitimately, by reason of its exceptional diligence, technology and discovery to obtain legitimate competitive advantage over competitors not possessing such knowledge or information and not able, legitimately and within a reasonable time frame, to obtain it otherwise. Telex obtained these trade secrets from IBM by a massive and persuasive program designed to induce the breach of known obligations of IBM employees or former employees. That such information or part of it could have been subsequently procured by Telex, given enough time and expense, by independent investigation, research or experience, did not justify Telex's conduct. That subsequent to the invasion of IBM's trade secrets a portion of the information in the course of marketing of IBM products became available to the public, including Telex, did not excuse Telex's conduct in the first instance nor insulate it from liability to both monetary and equitable relief. . . .'
 
 
 256
 In support of the foregoing conclusions, see the numerous cases and authorities cited on page 358 of the trial court's opinion. In sum, then, the trial court's holding that Telex misappropriated IBM trade secrets finds support in the record and is in accord with the applicable law on the subject. Before leaving this point, two related matters deserve brief comment.
 
 
 257
 Telex alternatively suggests that even if there be a misappropriation of trade secrets, IBM is barred from any recovery by the unclean hands doctrine. In this regard Telex asserts that the antitrust violations on the part of IBM preclude recovery for any possible misappropriation of trade secrets. Our resolution of Telex's claims for alleged antitrust violation has rendered this argument unavailing.
 
 
 258
 Also, Telex argues that federal patent laws so preempt the field that state trade secret laws are abated whether the trade secret in question be patented, patentable or unpatentable, citing in support of such proposition Kewanee Oil Co. v. Bicron Corp., 478 F.2d 1074 (6th Cir. 1973). This line of argument is now untenable under Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974), wherein the Supreme Court reversed the case relied on by Telex. Let us now turn to the matter of damages.
 
 
 259
 As above mentioned, the trial court awarded IBM the sum of $20,900,000 as compensatory damages. This sum is broken down as follows: (1) $7,500,000 as damages sustained by IBM in connection with its Aspen tape system; (2) $10,000,000 as damages sustained by IBM in connection with its Merlin disc system; (3) $3,000,000 as damages for increased plant security measures put into effect by IBM as a result of Telex's efforts to appropriate IBM trade secrets; and (4) $400,000 as additional expense incurred by IBM for work performed by IBM in its own plant, which work would otherwise have been farmed out at a lesser cost, but was not farmed out because of the fear by IBM that in so doing trade secrets would somehow be 'leaked' to outsiders, including Telex. The sum of these four items equals $20,900,000, the amount awarded IBM by the trial court as compensatory damages.
 
 
 260
 The IBM counterclaim being based on misappropriation of trade secrets, the measure of damages is governed by Oklahoma law. However, our attention has not been directed to any Oklahoma authority which is particularly helpful, and in such circumstance we resort to the general law on the subject. And unfortunately the general law as to the proper measure of damages in a trade secrets case is far from uniform. Four cases will perhaps illustrate the varying approaches to this problem.
 
 
 261
 In International Industries v. Warren Petroleum Corp., 248 F.2d 696 (3d Cir. 1957), the Third Circuit declared that by analogy to patent infringement, the proper measure of damages in a misappropriation of trade secrets case 'is not what the plaintiff lost, but rather the benefits, profits, or advantage gained by defendant in use of the trade secret.' In assessing the 'benefit' accruing to the misappropriator of trade secrets, that court applied the so-called 'standard of comparison' test. That test contemplates a comparison of the costs incurred by the defendant using the stolen trade secret, and the costs that would have been incurred had he not used the trade secret. The difference between the two is the 'benefit' accruing to the defendant, and is the measure of plaintiff's damages.
 
 
 262
 Somewhat in line with the foregoing is Gordon Form Lathe Co. v. Ford Motor Co., 133 F.2d 487 (6th Cir. 1943). That was a patent infringement case but, as was above mentioned, courts have indicated that trade secrets cases are analogous to patent infringement as concerns measure of damages. In Gordon Form Lathe Co., the court held that the correct measure of damages is the 'advantage' accruing to the infringer, namely, the 'savings' which the infringer derived from using the plaintiff's patent, which saving constitutes 'profit' which the plaintiff, the patent holder, was entitled to recover.
 
 
 263
 However, in Sperry Rand Corp. v. A--T--O, Inc., 447 F.2d 1387 (4th Cir. 1971), the Fourth Circuit indicated that perhaps 'loss' to the plaintiff, rather than 'benefit' to the defendant, was the better measure of damages in a misappropriation of trade secrets case. In this regard that court commented as follows:
 
 
 264
 '. . . There are two basic methods of assessing damages for misappropriation of trade secrets: one, the damages sustained by the victim (the traditional common law remedy), and the other, the profits earned by the wrongdoer by the use of the misappropriated material (an equitable remedy which treats the wrongdoer as trustee ex maleficio for the victim of the wrongdoer's gains from his wrongdoing). R. Ellis, Trade Secrets § 286 (1953); Restatement of the Law of Torts §§ 746 and 747 (1938); R. Callman, The Law of Unfair Competition, Trademarks and Monopolies § 59.3 (1965). Ordinarily a plaintiff may recover either, but not both, because to allow both would permit double recovery. Ellis, supra, § 287; Restatement, supra, § 747(c); Harley & Lund Corp. v. Murray Rubber Co., 31 F.2d 932 (2d Cir. 1929), cert. den., 279 U.S. 872, 49 S.Ct. 513, 73 L.Ed. 1007 (1929); Consolidated Boiler Corp. v. Bogue Elec. Co., 141 N.J.Eq. 550, 58 A.2d 759 (1949). Since the objective in allowing damages is to compensate the plaintiff for the difference in his position before and after the misappropriation of his secret, his probable loss may be the more significant measuring rod than the misappropriator's actual gain. Callman, supra, § 59.3 at 497. . . .'
 
 
 265
 In Clark v. Bunker, 453 F.2d 1006 (9th Cir. 1972), the Ninth Circuit indicated that the measure of damages for wilful misappropriation of a trade secret was not limited to the misappropriator's profits, and that the plaintiff there was also entitled to his 'loss,' which in that case was not in any manner related to the benefit accruing to the misappropriator. That court commented that since the unification of law and equity, the proper measure of damages was no longer an 'either or' matter, i.e., damages limited to either plaintiff's loss, or defendant's benefit, and that it could be a combination of both where the circumstances called for such in order to make the plaintiff whole. And perhaps that is a common thread in all of these cases, i.e., the plaintiff should be made whole, and, at the same time, there should be no double recovery. Let us examine the damages awarded in the instant case against this backdrop of cases.
 
 
 266
 As previously mentioned, the trial court awarded IBM the sum of $7,500,000 as damages sustained in connection with the Aspen project. Of this amount $4,500,000 represented monthly rentals lost by IBM as a result of Telex's misappropriation of trade secrets which enabled Telex to get its product on the market sooner than would otherwise have been the case. In other words, through the use of these trade secrets, Telex was able to market its peripheral units much sooner than if it had waited for the IBM product to be marketed, and then have duplicated it through reverse engineering. The net result was that because of its misappropriation of trade secrets Telex products displaced IBM products in the rental market sooner than would otherwise have been the case, resulting in a loss of rentals to IBM. In this regard the trial court first determined the total number of rental months lost by IBM, and then the average monthly rental price, and in this manner arrived at the loss incurred by IBM when its machines were displaced by Telex products, which rented at a lower figure. We find no error in the award of this sum, which represents a direct loss of income to IBM. There is some suggestion that this item should be limited to the 'net profit' which IBM would have realized from the continued rental of its products. The record indicates, however, that IBM lost the entire monthly rental when its products were displaced by Telex products. In sum, this item of damage is in our view proper, and finds support in the record.
 
 
 267
 The trial court also allowed IBM an additional $3,000,000 as further damage sustained by it in connection with the Aspen project. Some of the Telex products directly and immediately displaced IBM rental units. However, Telex also marketed its products to others who had not themselves done business with IBM. The trial court was of the view the IBM should be recouped for the profit realized by Telex in connection with the marketing of its products to persons other than those who had been using IBM products, and attempted to do so by determining the extent to which Telex had been unjustly enriched. In arriving at this award the trial court first found that IBM had expended $10,000,000 on the development of the Aspen project from the start of the program till the date of the first customer shipment, and that Gruver and others left IBM half way through the development program, taking with them a substantial part of the information developed through the first half of the program at the cost of $5,000,000. The trial court then recognized the 'standard of comparison' test referred to in International Industries v. Warren Petroleum Corp., supra, and attempted to ascertain the unjust enrichment accruing to Telex through savings, separate and apart from the specifically proven lost rentals. For this reason it scaled down the $5,000,000, which was the total unjust enrichment accruing to Telex, to $3,000,000, and awarded IBM that sum, in addition to the earlier award of $4,500,000. We think such was proper and is not a form of double recovery. Not to have allowed such would have been a denial to IBM of a substantial portion of the damage sustained by it in connection with the Aspen project. In sum, we are not inclined to disturb the award of the trial court of $7,500,000 in connection with the Aspen project.
 
 
 268
 In connection with the Merlin project, the trial court awarded IBM the sum of $10,000,000. This sum, according to the trial court, represented a saving to Telex which resulted in an unjust enrichment. In other words, if Telex had not misappropriated and used IBM trade secrets, it would have itself spent $10,000,000 more than it did in connection with the work on its equivalent of the Merlin disc. The trial court found that IBM had itself expended $30,000,000 to develop the Merlin, and that it took six years to do so. Telex, on the other hand, through the use of IBM trade secrets was able to develop its equivalent in some eighteen months. We recognize, as did the trial court, that Telex did not complete its Merlin project. Nevertheless, the trial court was of the view that Telex had saved itself $10,000,000 in its Merlin development and that it was unjustly enriched in that amount. We agree.
 
 
 269
 As was recognized in Gordon Form Lathe Co. v. Ford Motor Co.,supra, in a proceeding such as this one, damages can seldom be proven with mathematical certainty, 'nor anything approaching it, but we should reach the degree of likelihood on which reasonable men are content to act in the every day concerns of business life.' We conclude that the award of the trial court of damages for $7,500,000 in connection with the Aspen project, and $10,000,000 in connection with the Merlin project are not speculative, and, while such may not have been established with mathematical precision, they do meet the 'degree of likelihood' test. The fact that such damages may be difficult to pin down should not militate in favor of the wrongdoer.
 
 
 270
 The trial court also awarded IBM the sum of $3,000,000 for 'increased extraordinary security costs reasonably occasioned by Telex's unlawful activities,' the trial court observing that such figure was a 'fair approximation' and a 'nonspeculative' minimum amount. In our view, however, this particular item is speculative and cannot be sustained. The reasoning of the court was that this stepped-up plant security on the part of IBM, consisting of additional guards, television cameras, sensors, locks, safes, computer-controlled access system, and the like, was occasioned by the fact that Telex was luring IBM's employees away from IBM by the offer of substantial salary increases, and bonuses. This item of damage might well under different circumstances be proper. But here we fail to perceive how the increased security costs were the proximate result of Telex's hiring of IBM employees. Telex was not climbing fences or breaking down doors in its appropriation of IBM trade secrets. Telex's methods were more subtle, involving the luring of IBM employees who brought with them the trade secrets in question. In any event, we fail to see how this particular $3,000,000 figure is attributable to Telex and it is too tenuous to be permitted to stand.
 
 
 271
 Finally, as concerns compensatory damage, the trial court awarded IBM the sum of $400,000 for the increased cost of manufacturing the Merlin head arm within IBM. We fail to see how this management decision on the part of IBM to perform certain work within its own plant, rather than farming out the work, can be attributable to the fact that Telex was stealing IBM employees. This item of damage is also far too speculative to be permitted to stand.
 
 
 272
 The trial court awarded the sum of $1,000,000 as punitive damages. In this regard Telex in its brief concedes that punitive damages are generally a matter of discretion with the trial court, and, under all of the circumstances, we find no abuse of discretion by the trial court in its assessment of punitive damages. Indeed, in view of what we deem to be rather flagrant conduct on the part of Telex, the trial court exhibited considerable restraint in its award of punitive damages.
 
 
 273
 Accordingly, as concerns the IBM counterclaim, the trial court's award of compensatory damages is reduced to $17,500,000, and the judgment as thus reduced, including the award of $1,000,000 as punitive damages, is affirmed.
 
 VIII.
 
 274
 DISPOSITION OF THE CASE.
 
 
 275
 The judgment of the trial court against IBM must be reversed because it is based upon an erroneous determination of a fundamental element in the case. This element is the 'market' as the term is used in the antitrust laws, and in which the competition, the market shares, the acts, and the identity of the competitors may be evaluated and compared. The trial court's definition of this 'market' was in error as described above.
 
 
 276
 The judgment against IBM must also be reversed because, as stated above, the findings of fact as to the 'acts' of IBM made by the trial court when evaluated under the Sherman Act and when set in the context of the prevailing court opinions do not constitute a violation of law.
 
 
 277
 The judgment of the trial court against Telex on the counterclaim of IBM for the misappropriation of trade secrets, the property of IBM, is reduced to $17,500,000, as compensatory damages, and is so affirmed. The award of punitive damages to IBM on the same counterclaim in the amount of $1,000,000 is affirmed.
 
 
 278
 The judgment insofar as it awards attorney fees and costs is set aside, and that matter is remanded to the trial court for further consideration. The parties in this court shall each bear their costs and attorney fees.
 
 
 279
 The case is so reversed, and is remanded for entry of judgment for defendant on the complaint, for consideration of trial costs and trial attorney fees, and for entry of judgment for IBM on its counterclaim as above provided.*
 
 
 
 [1]
 By way of comparison, Telex's share of the total EDP industry has been considerably smaller than IBM's, although its growth has been rapid. Telex reported EDP revenues of $870,000 in fiscal 1967, increasing to almost $57 million in fiscal 1971
 
 
 [2]
 The court made findings as to the market share of IBM in the plug compatible peripheral market as follows:
 In Finding 66, Finding 67 and Finding 68, the District Court enunciates the statistics which it feels are relevant to a consideration of IBM's status in this 'plug compatible peripheral market.' IBM's revenues in 1970 for its plug compatible peripheral products equalled $1,137,819,000--slightly less than one-third of its total 1970 revenues for all electronic data processing products. In that same year, all other manufacturers of IBM plug compatible peripheral products received slightly less than $100 million in revenues. With regard to revenues from specific types of peripheral products in 1970, IBM was said to have 90% of revenues from tape units attached to IBM CPU's, with plug compatible competitors having 10%; IBM had 68% of revenues from disk drive units, with competitors having 32%; IBM had 99.6% of all revenues for memory products attached to IBM CPU's, with competitors having the remaining 0.4%; IBM had 92.3% of revenues from communications controllers attached to IBM CPU's, with competitors having the remaining 7.7%.
 Based on the above and other figures, qualified by certain other factors which the District Court felt appropriate, the court made a specific finding that IBM's share of the relevant submarkets or the combined submarkets comprehended in the general market classification 'peripheral equipment plug compatible to IBM' was such as to permit and support an inference of monopoly power on the part of IBM.
 
 
 [3]
 A cursory analysis of many of the exhibits relative to the work of the Cooley Task Force leaves one with some doubt as to whether the findings of the court are established. These exhibits do reflect that the task force was concentrating on the subject of plug compatible peripherals, that they were interested in determining IBM's 'exposure areas,' and that they wanted to develop an 'optimum strategy.' The exhibits also indicate that the competitive areas were being studied on a product-by-product basis. But the exhibits also indicate that the task force was concerned with better economies and price performance, accelerated technological development, and shielding products through subsystem design as a way of maintaining IBM's market share. The task force did evidence an interest in knowing about IBM competitors' economic 'viability, or lack thereof,' in particular about Telex and Memorex
 Briefing charts used by the task force in its report to the Management Committee on July 31 indicated that price was the big reason why IBM was losing customers in the plug compatible market. The Management Committee was also given forecasts of what would happen to IBM's share of the plug compatible peripheral market by 1976 if the trend of erosion continued. Whatever decisions were reached in the Management Committee meeting, Cooley concluded in an August 3 memo that future action in the peripherals area would be 'product strategy oriented.'
 
 
 [4]
 IBM argued that the 2319A was a competitive response to market conditions. They also justified the project on the ground that it enabled them to reuse 2314 disk units which were being turned back into IBM by customers who were switching to competitors' plug peripheral products. While the court considered this argument, it considered it of minor importance as a motive for IBM's price cut. Instead, it considered the 2319A a price cut not justified on the basis of reduced manufacturing costs, designed to have the maximum impact on IBM's plug compatible competitors. It considered the price cut designed to contain and suppress IBM's plug compatible disk competition, and intended to unlawfully maintain IBM's monopoly share of the disk drive market
 
 
 [5]
 The court did acknowledge that the price cut was not below cost or below a reasonable expectation of profit for IBM. (Finding 111a)
 
 
 [6]
 The District Court found that at this time Telex was IBM's leading competitor in the plug compatible field
 
 
 [7]
 Mr. Pfeiffer, President of IBM's Data Processing Division, reported:
 'Telex is actively marketing their new 1403 plug compatible printer. It is faster, cheaper and has unique on-line or off-line capability. On top of these advantages, Telex offers unlimited use versus our 30% additional use charge on the 1403. This raises the Telex discount from 25% to 40%. Since the first of the year, 99 Telex competitive situations have been reported.
 'The key attraction to Telex is the unlimited use plan. Our 30% additional use charge is a source of customer irritation as well as expense. . . . We believe that an earlier response to the needs of the marketplace is called for.' (PB 52; E 989).
 
 
 [8]
 Referred to under the code name of SMASH (shades of James Bond!)
 
 
 [9]
 Finding 134 details this as follows:
 'Statistically, the number of IBM employees hired by Telex has not been impressive. Of those personnel who had formerly been employed by IBM some of them were employed by Telex after intervening employment by third parties and some were employed immediately after the termination of their employment at IBM. On March 31, 1970, Telex employed 50 engineers of whom one was a former employee of IBM. On March 31, 1971, Telex employed a total of 88 engineers, of whom 18 were former IBM employees, 8 of these were employed directly from IBM. On March 31, 1972, Telex employed a total of 145 engineers, of whom 31 were former IBM employees; 13 of these were employed directly from IBM positions. On March 31, 1973, Telex employed a total of 129 engineers, of whom 12 were former IBM employees; 3 of these were employed directly from IBM. The remainder of Telex's engineering staff was employed after no previous IBM experience. They were obtained either directly from schools or with work experience from self-employment or from some 60 other employers. One of the principal sources of engineering personnel was RCA, which abandoned its electronic data processing venture in 1971; a total of 32 of Telex engineers employed as of March 31, 1973, came to Telex directly from RCA. On March 31, 1973, Telex had a total employees of 1,929, of whom 152 had former IBM employment experience.'
 
 
 [10]
 Telex never actually completed its project of copying a Merlin-type subsystem, but stopped work on the project in April 1972, at which time the court estimated that it had completed more than half of the work on the project. In May 1972, Telex sold its rights to the Merlin-type project under a license agreement to Control Data Corporation. The court found that at the time of abandonment of the project in April 1972, as a proximate result of improper utilization of IBM trade secrets, Telex had unjustly enriched itself at IBM's expense in the amount of at least $10 million
 
 
 [11]
 Over 250 companies manufacture peripheral devices for use in non-IBM computer systems, and 100 of these companies supply peripheral products for IBM systems. Because it is relatively easy to adapt peripheral equipment for installation in another system, most companies (including Telex) market their equipment for installation in more than one system. Thus, the 'plug compatible' peripheral equipment marketed for use in one system is the same as that marketed for use in another system, except for a necessary change in the 'interface.' IBM claims that the cost of modifying an interface so that it can be used with another system amounts to less than 1% of the product's purchase price
 
 
 [12]
 IBM maintains that even assuming that the relevant market was correctly defined, IBM lacked monopoly power for the following reasons:
 
 
 [1]
 Expert economic witnesses for both parties agreed that, absent control over the entry and growth of competitors, there is no monopoly power. In the plug compatible peripheral industry, the number of companies supplying peripherals has grown from three in 1966 to over 100 in 1974. Such entry into the market has been relatively easy since the PCM merely copies the products originated by IBM
 
 
 [2]
 The dramatic improvement in product performance together with the reduction in the price of peripherals disproves monopoly power. Progressively better products at progressively lower prices were not present in cases where monopolization existed
 
 
 [3]
 The rapid rate at which IBM's PCM competition has taken peripheral business from IBM in the last five years is inconsistent with the existence of monopoly power
 
 
 [4]
 The sophistication, power, and knowledge of computer customers have put pressure on IBM and its competitors. Because sophisticated customers are able to demand and select the best, the number of competitive alternatives has increased, making success in the peripheral market well earned and difficult to achieve
 
 
 [5]
 The growth, innovation, and increasingly technological changes in peripheral products are antithetical to the stagnancy which characterizes monopolization
 
 
 [6]
 Competition by superior business skill, better products, and greater efficiency, industry, and foresight do not give rise to monopolization. These qualities are allegedly responsible for IBM's success in the market
 
 
 [7]
 Many competitive systems manufacturers (e.g. Control Data, Burroughs, Digital Equipment Co., Hewlett-Packard, Honeywell) supply plug compatible peripherals for installation in IBM systems. The ease with which other EDP systems companies can enter into the IBM market is further evidence of the increase in competition in the peripherals industry
 
 
 [8]
 IBM's continual introduction of new products does not constitute monopoly power, but represents the historic, legitimate, and merely temporary advantage of the innovator over the copier
 
 
 [13]
 See Finding 37
 
 
 [14]
 Findings 52 and 53 are as follows:
 'F52. The court finds that the peripheral devices plug compatible with the CPU's of IBM may be considered the relevant market for the purposes of this case, and that relevant submarkets existed for plug compatible tapes, disks, memories, and printers with their respective controllers, and communications controllers.
 'F53. CPU's are not reasonably includable within this market and these submarkets, nor are software as such, but the peripheral equipment plug compatible to IBM CPU's which are separately leased by leasing companies to end-users are. Alternate sources of computer time such as service bureaus, timesharing companies, data centers, users selling excess time and the like are not reasonably includable in the relevant market or submarkets with which we are concerned in this case, since their competitive relationships are tangential and indirect, and do not supply a real or substantial competitive force in the relevant markets mentioned. It is true that a large part of the competition in the industry takes place on a systems basis, but the relationship of this competition to the relevant markets with which we are concerned against is tangential and practically indiscernible. Certainly in another context the competition between systems manufacturers would constitute, or be a part of, a relevant market, but such relevant market is not material under the facts of this case since the competition involved here is not between systems manufacturers but between IBM and plug compatible manufacturers and suppliers.
 
 
 [15]
 This is all expressed in the court's final wrap-up on this factual issue
 
 
 [16]
 See Finding 38
 
 
 [17]
 See Finding 61. For example, according to the U.S. Bureau of the Census figures, IBM's share of the value of 1971 equipment of 'electronic computers and peripheral equipment, except parts,' was only 36.7 per cent
 
 
 [18]
 Additional light on this subject is derived from Mr. Grant, senior vice president of Telex, who stated:
 'Q. How about this problem with interfaces, Mr. Grant? Generally speaking, on these peripheral products, what is involved in changing the interface from an interface which will plug in with an IBM system and one which will plug in with another system? A. I don't think I'm qualified to give you an answer to that.
 'Q. Sir? A. I don't believe I'm qualified to give you an answer to that.
 'Q. Well, you believe, don't you sir; and have said many times before, within the company, that the expense in order to change interfaces is minimal, haven't you?
 A. I have said that the engineering expense associated with the development of interfaces is a minimal expenditure.
 'Q. And you have been an advocate, have you not, of modifying the interfaces in a way that would enable Telex to attach its products to systems manufactured by other system manufacturers other than IBM? A. Yes, I have.
 'Q. How long Mr. Grant, have you urged upon your fellow officers at Telex, that Telex ought to modify its interfaces and offer its products for attachment to other systems other than IBM. A. I don't recall, specifically, but in the general area--the initial request and the initial effort was approximately two or two and a half years ago.'
 
 
 [19]
 One of the points of information which Wheeler wished to have included in his letter was the following:
 '(f) We would be willing to interface our equipment with their mainframe at no cost to them and offer this equipment on lease to their customers if they would prefer this route (this would be a mild threat that we could possibly compete with them in the market place if they didn't get on our band wagon.'
 
 
 *
 Each member of the panel named above collaborated fully in the preparation and writing of the within opinion